THE NATIONAL SCREW AND MANUFACTURING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 33291. Filed May 29, 1959.

*M. E. Newcomer, Esq., H. V. E. Mitchell, Esq.*, and *A. W. Geater, C.P.A.*, for the petitioner.
*William O. Allen, Esq.*, for the respondent.

FORRESTER, *Judge:* By this proceeding petitioner challenges the Commissioner's disallowance of its claims under section 722, I.R.C. 1939, for relief from excess profits tax liabilities in the following amounts for the respective fiscal periods:

| Period | Amount |
| --- | --- |
| Calendar year 1940 | $17, 910. 27 |
| Jan. 1, 1941–Nov. 30, 1941 | 822, 008. 85 |
| Dec. 1, 1941–Nov. 30, 1942 | 466, 631. 28 |
| Dec. 1, 1942–Nov. 30, 1943 | 370, 105. 43 |
| Dec. 1, 1943–Nov. 30, 1944 | 1, 187, 868. 97 |
| Dec. 1, 1944–Nov. 30, 1945 | 483, 056. 22 |

### FINDINGS OF FACT.

Certain facts have been stipulated and are hereby so found.

Petitioner, a corporation organized under the laws of Ohio, maintained its principal office and place of business at Cleveland, Ohio. Prior to January 1, 1941, petitioner was on a calendar year basis. The taxable periods involved herein are calendar year 1940, the short fiscal period ended November 30, 1941, and fiscal years ended November 30, 1942 through 1945. Petitioner at all times kept its books and records and filed its tax returns on an accrual basis.

Petitioner filed with the then collector of internal revenue for the 18th district of Ohio, at Cleveland, its timely income and excess profits tax returns for 1940, the fiscal period ended November 30, 1941, and fiscal years 1942 through 1946.

Petitioner's timely applications under section 722(b)(4), I.R.C. 1939, claimed relief on the ground that petitioner during the base period had drastically changed its management and its manufacturing and marketing procedures and policies, that it commenced the manufacture and distribution of important new products and that such changes produced and resulted in a higher level of earnings not adequately or fully reflected in petitioner's actual base period net income.

Petitioner is entitled to compute its excess profits credit for each fiscal period involved by the "income credit" method, using its excess profits net income during its base period, calendar years 1936 through 1939. Petitioner's excess profits net income (or deficit) for each base period year computed by the "income credit" method, and without regard to section 722 or 713, is as follows:

| | 1940 | 1941 and subsequent years |
| --- | --- | --- |
| 1936 | $171, 583. 15 | $201, 214. 86 |
| 1937 | 484, 845. 73 | 632, 921. 26 |
| 1938 | (344, 439. 58) | (344, 439. 58) |
| 1939 | (71, 628. 26) | (71, 628. 26) |

Petitioner's average base period net income (general average) without regard to section 722 or 713, and its average base period net income

computed by the 75 per cent or deficit rules under section 713, were stipulated to be as follows for each taxable period:

| Year | General average | ABPNI under sec. 713 |
|------|-----------------|----------------------|
| 1940 | $60,090.26 | $146,200.16 |
| 1941 | 104,517.07 | 190,626.96 |
| 1942 | 104,517.07 | 238,283.70 |
| 1943 | 104,517.07 | 238,283.70 |
| 1944 | 104,517.07 | 238,283.70 |
| 1945 | 104,517.07 | 238,283.70 |

In its applications for relief and supporting data for each fiscal period, petitioner claimed the following constructive average base period net income (CABPNI) under section 722:

| Year | CABPNI | Year | CABPNI |
|------|--------|------|--------|
| 1940 | $1,062,102.51 | 1943 | $1,190,354.15 |
| 1941 | 1,190,354.15 | 1944 | 1,190,354.15 |
| 1942 | 1,190,354.15 | 1945 | 1,190,354.15 |

In its applications for relief and related refund claims for each fiscal period involved, petitioner claimed that its average base period net income was an inadequate standard of normal earnings, that its excess profits tax liability for each fiscal period without the benefit of section 722 was excessive and discriminatory, and that it was entitled to compute its excess profits tax liability for each fiscal period pursuant to section 722. It so computed its liability for each fiscal period as follows:

| Fiscal period ended | Claimed liability under sec. 722 |
|---------------------|----------------------------------|
| Dec. 31, 1940 | ------------- |
| Nov. 30, 1941 | $99,513.31 |
| Nov. 30, 1942 | 1,364,406.01 |
| Nov. 30, 1943 | 3,369,653.21 |
| Nov. 30, 1944 | 601,274.91 |
| Nov. 30, 1945 | 941,194.04 |

Respondent determined petitioner's excess profits tax liability for the taxable periods involved, without the benefit of section 722, as follows:

| Fiscal period ended | Excess profits tax liability |
|---------------------|------------------------------|
| Dec. 31, 1940 | $17,910.27 |
| Nov. 30, 1941 | 921,522.16 |
| Nov. 30, 1942 | 1,831,037.29 |
| Nov. 30, 1943 | 3,739,758.64 |
| Nov. 30, 1944 | 1,789,143.88 |
| Nov. 30, 1945 | 1,424,250.26 |

In his notice of deficiency and disallowance dated January 5, 1951, respondent determined the following excess profits credits on the invested capital basis:

| Fiscal period ended | Credit |
|---|---|
| Dec. 31, 1940 | $298,384.57 |
| Nov. 30, 1941 | 322,272.82 |
| Nov. 30, 1942 | 362,710.97 |
| Nov. 30, 1943 | 408,682.26 |
| Nov. 30, 1944 | [1] 484,005.36<br>[2] 472,004.59 |
| Nov. 30, 1945 | 517,045.66 |

[1] Under 1943 law.
[2] Under 1944 law.

Petitioner paid to the collector of internal revenue at Cleveland, Ohio, the excess profits tax liability determined by respondent for each fiscal period.

Petitioner's net sales, after renegotiation, and its excess profits net income after all agreed adjustments on final audit of its income and excess profits tax liability, but before any allowance under section 722, were as follows:

| Fiscal period ended | Net sales | Excess profits tax net income | (Invested capital method) |
|---|---|---|---|
| Dec. 31, 1940 | $5,529,837 | $364,556.76 | |
| Nov. 30, 1941 | 9,932,316 | 1,905,502.56<br>2,682,360.58 | (11 months)<br>(Annual basis 365/334) |
| Nov. 30, 1942 | 14,531,612 | 2,996,935.67 | (Same under both 1941 and 1942 Act) |
| Nov. 30, 1943 | 22,344,957 | 4,880,645.85 | |
| Nov. 30, 1944 | 19,844,741 | 3,734,895.59<br>2,907,024.94 | (Before operating loss carryback from 1946)<br>(After operating loss carryback of $828,542.53) |
| Nov. 30, 1945 | 16,173,379 | 2,241,648.19 | |

At all times material, petitioner manufactured and sold metal bolts, screws, rivets, and allied products to a wide variety of customers in many industries. It manufactured those products at plants located at Cleveland, Ohio.

From 1920 through 1929, W. D. B. Alexander served as petitioner's president and chief executive officer. An active, energetic executive, his subordinates respected his devotion to petitioner. From 1922 through 1929, petitioner made the following capital expenditures for new equipment and facilities:

| Year | Expenditure | Year | Expenditure |
|---|---|---|---|
| 1922 | $168,165 | 1926 | $222,704 |
| 1923 | 730,768 | 1927 | 300,568 |
| 1924 | 155,251 | 1928 | 369,594 |
| 1925 | 325,639 | 1929 | 350,302 |

Alexander lacked the faculty of delegation, and did not give competent men responsibility and adequate training to replace petitioner's top executives. He owned or controlled a substantial number of petitioner's outstanding shares.

Petitioner's net sales, net income before and after taxes, and dividends declared for each of the years 1922 through 1929, were as follows:

| Year | Net sales | Net income | | Cash dividends (declared basis) | |
|---|---|---|---|---|---|
| | | Before taxes | After taxes | Preferred | Common |
| 1922 | $4,784,317 | $843,868 | $753,868 | | $315,000 |
| 1923 | 6,919,131 | 1,045,718 | 920,718 | $122,500 | 245,000 |
| 1924 | 6,084,021 | 527,216 | 474,216 | 245,000 | 245,000 |
| 1925 | 7,136,942 | 679,669 | 589,669 | 122,500 | 455,000 |
| 1926 | 5,944,885 | 477,470 | 421,470 | 122,500 | 245,000 |
| 1927 | 5,559,730 | 373,591 | 333,591 | 122,500 | 245,000 |
| 1928 | 7,277,652 | 998,578 | 885,883 | 122,500 | 385,000 |
| 1929 | 7,381,708 | 1,278,805 | 1,146,369 | 122,500 | 490,000 |

Upon the death of W. D. B. Alexander in 1929, his son, H. G. Alexander, succeeded him as president of petitioner. While petitioner had employed H. G. Alexander for some years prior to 1929, he appeared to take little interest in the business both before and after becoming president. He spent much time in personal activities away from the office. He seldom observed manufacturing operations in the plant. He did not call on customer accounts. He ignored sales figures and statistical data furnished to him. From 1929 through 1939, petitioner made the following capital expenditures for new equipment and facilities:

| Year | Expenditure | Year | Expenditure |
|---|---|---|---|
| 1929 | $350,302 | 1935 | $6,178 |
| 1930 | 60,789 | 1936 | 62,949 |
| 1931 | 12,394 | 1937 | 135,150 |
| 1932 | 40,542 | 1938 | 123,795 |
| 1933 | 7,560 | 1939 | 81,071 |
| 1934 | 43,172 | | |

Petitioner's industry, as well as general business, experienced a poor or depressed year in 1938; however, petitioner's decrease in business volume was not disproportionate to the decrease for the entire industry.

In 1937, the following served as petitioner's officers and directors:

| Officers | Directors |
|---|---|
| Chairman of Board, D. C. Griese. | D. C. Griese |
| President, H. G. Alexander. | H. G. Alexander |
| 1st vice president and sales manager, C. H. Palmer. | C. R. Elliott |
| 2d vice president, C. R. Elliott. | E. E. Griese |
| Secretary, Howard Beidler. | C. H. Palmer |
| Treasurer, E. E. Griese. | C. W. Brainerd |
| | Howard Beidler |
| | E. H. Griese |
| | J. E. Williams |
| | C. M. Lemperly |

Petitioner's net sales, net profit before taxes, net income after taxes, and dividends declared, for each year, 1930 through 1939, were as follows:

| Year | Net sales | Net profit before taxes [1] | Net income after taxes [1] | Cash dividends (declared basis) | |
|---|---|---|---|---|---|
| | | | | Preferred | Common |
| 1930 | $4,172,512 | $2,223 | $2,223 | $122,500 | --- |
| 1931 | 2,468,688 | (474,609) | (474,609) | (²) | $210,000 |
| 1932 | 1,487,551 | (455,131) | (455,131) | --- | 87,500 |
| 1933 | 2,194,277 | 13,673 | 13,673 | --- | 52,500 |
| 1934 | 2,968,892 | 155,620 | 142,120 | --- | 105,000 |
| 1935 | 2,964,726 | (201,070) | (201,070) | --- | 70,000 |
| 1936 | 3,972,659 | 241,709 | 212,498 | --- | 140,000 |
| 1937 | 5,607,095 | 675,608 | 517,798 | --- | 261,750 |
| 1938 | 3,022,222 | (322,556) | (313,039) | --- | 43,625 |
| 1939 | 4,622,893 | (78,543) | (78,517) | --- | 4,363 |

[1] ( ) Indicates loss.
² 7 per cent preferred stock was retired October 1, 1931.

Early in 1937, petitioner employed Charles Newpher as assistant to the president in a sales capacity. He had previously served for a substantial period of time as a sales executive of Upson Nut Company, hereafter referred to as Upson, a division of Republic Steel Corporation. Newpher was elected vice president in charge of sales of petitioner in January 1938, replacing Palmer, and a director in January 1939. He occupied those positions during the taxable years.

Prior to the middle of 1937, a rift developed progressively between two major factions of petitioner's stockholders, that led by D. C. Griese, who with his family controlled a substantial number of shares, and the Alexander faction led by the incumbent president. The Griese faction thought Alexander incompetent, inattentive, and lazy. They became dissatisfied with the management and believed their large investments were in jeopardy. In the middle of 1937, D. C. Griese, Brainerd, and Elliott, large shareholders of petitioner, consulted William McAfee, a Cleveland attorney, then an active director of several large industrial concerns and of a large bank, to solicit his aid in obtaining a change in management. To allow him to become more conversant with petitioner's difficulties the shareholders elected McAfee a director at the annual meeting on January 27, 1938. At that meeting the shareholders also elected the following six directors:

D. C. Griese  
H. G. Alexander  
C. R. Elliott  
E. E. Griese  
C. W. Brainerd  
W. C. Connelly

Immediately following the annual shareholders' meeting in January 1938, the new board of directors elected the following officers:

D. C. Griese, chairman of the board.  
H. G. Alexander, president.  
C. R. Elliott, vice president.  
C. F. Newpher, vice president in charge of sales.  
E. E. Griese, secretary and treasurer.

On February 1, 1938, petitioner terminated the employment of Howard Beidler as secretary and C. H. Palmer in the sales department.

After serving on the board for approximately 7 months and observing the management and operation of petitioner, McAfee recommended that petitioner retain a management consulting firm to survey its affairs. As a result it employed a firm of consultants on September 26, 1938, to generally survey and analyze petitioner's affairs, render a general opinion covering conditions found in the major departments, and make recommendations.

After a brief survey in October 1938, the consultants rendered a preliminary report to petitioner based on operational data supplied by petitioner's personnel, accumulated information with respect to the industry, interviews with members of petitioner's organization and of competing firms, and field observations. This report, although general in nature, agreed with the opinion of McAfee and the Griese faction that petitioner needed changes in top management and in manufacturing and distributing procedures and policies. It also suggested the need for exhaustive study of petitioner's problems.

On November 29, 1938, the consultants agreed to provide a complete and detailed study of petitioner's operations. This survey began about December 1, 1938, and continued until the rendition of a final report based upon the survey on July 31, 1939. Prior to July 31, 1939, the consultants submitted supplemental written reports to petitioner on particular phases of petitioner's operations.

Shortly after the consultants commenced the detailed survey they recommended that a new president replace Alexander, that petitioner make a number of other changes in top management and that it establish definite responsibilities of the officers and department heads. The consultants conferred with directors D. C. Griese, E. E. Griese, McAfee, and Connelly with respect to those recommendations. The consultants also suggested the employment, as president, of H. P. Ladds, then president of Sweets Steel Company of Williamsport, Pennsylvania, hereafter referred to as Sweets, a concern engaged in the fabrication of metal products.

Upon the recommendations of the consultants, petitioner employed Ladds to take charge of its affairs and the shareholders at their annual meeting on January 26, 1939, elected him a director. At a meeting held on that date the board of directors elected Ladds president and Alexander chairman of the board. D. C. Griese retired from the latter office. Newpher replaced C. R. Elliott on the board. Elliott left the employ of petitioner on January 1, 1940.

At their annual meetings of January 26, 1939, and January 25, 1940, respectively, petitioner's shareholders elected the following directors:

| 1939 | 1940 |
|------|------|
| H. G. Alexander | H. P. Ladds |
| H. P. Ladds | C. F. Newpher |
| C. F. Newpher | E. E. Griese |
| E. E. Griese | C. R. Elliott |
| C. W. Brainerd | William A. McAfee |
| W. C. Connelly | T. R. Goodridge |
| C. R. Elliott | C. M. Lemperly |
| D. C. Griese | C. I. Ochs |
| William A. McAfee | A. W. Lueke |

Ladds assumed the duties of president on March 1, 1939. Prior to his employment by Sweets in 1937, Ladds had been successively vice president and general manager of Maryland Bolt & Nut Company (1924–1928), general sales manager of Lake Erie Bolt & Nut Company from 1929 until that company was absorbed by Lamson & Sessions Company, hereafter referred to as Lamson, about a year and a half later, and vice president and general manager of the Birmingham plant of Lamson (1932–1937). He had also been employed prior to World War I by Upson. Those concerns manufactured and distributed products of the same general type and nature as petitioner. Ladds knew all phases of the bolt, nut, and screw business. He had wide acquaintances with industry members, and with distributors and consumers of industry products.

After assuming the presidency, Ladds personally contacted department heads and company personnel, observed the operating procedures in the manufacturing, shipping, and sales departments, and closely attended to the field notes and recommendations made by the consultants prior to completion of their survey.

In line with the recommendations of the consultants, petitioner made numerous changes in executive personnel in 1939. With the active assistance of the consultants, it employed a new controller, D. F. Zehrung, in March 1939, and a new assistant superintendent, H. G. Westbrook, in May 1939. Petitioner assigned a number of top plant department heads to new positions and responsibilities in July and August 1939. In addition, it terminated the services of the following executive personnel on the dates as shown below, along with compensation paid to them in 1939:

| Name | Title | Date | Compensation paid by petitioner in 1939 |
|------|-------|------|------------------|
| H. G. Alexander | Chairman of board | Dec. 31, 1939 | $14,580.00 |
| C. R. Elliott | Vice president | Dec. 31, 1939 | 5,291.00 |
| E. H. Griese | Assistant superintendent | Aug. 1939 | 7,776.00 |
| F. B. Davis | Engineer | Nov. 1939 | 4,537.50 |
| | | | 32,184.50 |

Late in 1939, petitioner terminated the services of five other salaried employees to whom it paid a total of $5,659.55 of compensation in 1939.

The changes in the executive and department-head personnel, the employment of new personnel, and the realignment of responsibilities of the various department heads and assistants required a substantial period of time. Petitioner did not accomplish some changes until 1940. Petitioner made the following terminations and changes in executive and office personnel in 1940, along with the compensation paid in 1939 to those persons whose services it terminated:

| Name | Title | | Date of change | Compensation paid by petitioner in 1939 |
| | Before change | After change | | |
| --- | --- | --- | --- | --- |
| K. R. Woodring | Comptroller | Separated | Sept. 1940 | $3,600.00 |
| T. S. Cope | Supt | Separated | May 1940 | 7,776.00 |
| P. O. Troescher | Asst. Supt | Supt | Mar. 1940 | |
| H. H. Krause | Dir. of Pur | Separated | May 1940 | 4,276.80 |
| G. R. Money | Constr. Eng | Maint. Eng | Apr. 1940 | |
| Fred Wess | Supt. #2 Plant | Spoke Foreman | Aug. 1940 | |
| H. L. Hopkins | Chief Metallurgist | Supt. #2 Plant | Sept. 1940 | |
| Adelaide L. Hohing | | Separated | 1940 | 2,970.00 |
| T. R. Street | | Separated | 1940 | 1,200.00 |
| | | | | 19,822.80 |

The final report by the consultants in July 1939 detailed recommendations as to changes in plant operating methods and procedures for effecting cost savings and achieving efficiency. It also detailed numerous changes in plant operations made between January 1 and July 31, 1939, at the suggestion of the consultants.

As to plant operations, the consultants recommended the following changes and estimated cost savings with respect to each:

(a) Consolidation of packing and shipping departments;
(b) Decentralization of product washing operations;
(c) Consolidation of plant maintenance groups;
(d) Relocation of shook and keg storage and boxmaking activities;
(e) Reorganization of interdepartmental transportation and product handling facilities;
(f) Reorganization of toolroom, machine shop, tap manufacturing department, and powerhouse;
(g) Reduction in number of indirect and nonproductive factory employees.

Petitioner had commenced some of these recommended changes prior to the rendition of the final report.

The report of the consultants contained recommendations for improving the efficiency of various operating departments in the plant, for the establishment of production standards, for the handling of orders, production schedules and shipments, and in respect of accounting practices and procedures.

Prior to the survey by the consultants, petitioner's plant had five packaging departments located in different areas, each with separate employees and supervision. The consultants recommended consolidation of all activities pertaining to product stocking, packaging, packing, shipment assembly, and shipping in one general floor area under one active supervisor. The report estimated the consolidation would enable elimination of 28 employees and 2 salaried supervisors, with annual payroll savings of $32,000.

In accordance with the foregoing recommendation, petitioner consolidated all packing and shipping, except of spokes and nipples, into 1 unit under 1 supervisor prior to December 31, 1939. Between September 1 and November 30, 1939, petitioner released from these departments 14 employees. Between August 1 and October 15, 1939, petitioner transferred 8 employees from the shipping and packing departments to other departments. At the hourly rates paid them and on the basis of 2,000 working hours per year, the annual compensation of the employees released and of those transferred totaled $15,320 and $9,400, respectively. Early in 1940, petitioner demoted 2 foremen in those departments to an hourly rate at total annual savings of $800.

The consultants recommended that petitioner establish a separate washing unit in each department to eliminate the labor and equipment cost of transporting products to the central washing department and to utilize, for washing purposes, indirect labor already employed in such departments. Previously, petitioner utilized a centralized washing department to which it transported products for washing after each operation and then returned them to the production line for the next operation. Various products required as many as three washings. The report estimated annual cost savings from this change of $13,000.

Prior to July 31, 1939, petitioner installed small, individual washers in 4 operating departments and eliminated all 15 employees of the central washing department.

The consultants also recommended the consolidation of maintenance groups into one centralized group to reduce payroll and control maintenance expense. Previously, petitioner had stationed independent maintenance groups at separate locations in the plant, each directed by a salaried foreman. The report estimated that petitioner could reduce the maintenance force by 20 employees, including 4 supervisory employees, at an annual payroll saving of $26,000.

The consolidation of the maintenance groups occurred during the latter part of 1939. Between September 1 and November 30, 1939, petitioner released 8 maintenance employees. Between September 15 and November 30, 1939, petitioner transferred 5 maintenance employees to other departments. At the hourly rates paid to them, the

annual compensation of the employees released and those transferred totaled $10,420 and $5,680, respectively. In 1940, petitioner demoted 3 salaried foremen to an hourly rate and released 1 additional foreman, at estimated annual savings of approximately $4,500.

The consultants recommended the relocation of the shook (knocked-down kegs) and keg storage and boxmaking activities in the central plant near the sidetrack, to minimize material handling. This department, previously located across the street from petitioner's central plant, received materials by rail although the building in which it was located had no sidetrack facilities. The materials received had to be transported from the siding to the department and then retransported to the shipping department in the central plant. The report estimated annual cost savings of $3,000. Petitioner accomplished the change prior to December 31, 1939. The relocation saved the expenses of 3 men.

The consultants also recommended more effective scheduling of the use of electric trucks and dollies in transporting products between departments in the course of manufacture, to effect payroll economies and expedite movement of stock. It estimated annual cost savings of $8,000. Petitioner accomplished the change prior to December 31, 1939. Before the change, intraplant transportation operations utilized approximately 15 tractors and 15 operators. After the change, petitioner dispensed with 5 tractors and 5 operators and saved approximately 1 day's time in the manufacturing process.

During the survey the consultants recommended a number of general improvements in the plant-operating organization to coordinate more closely departmental functions. They recommended that the chief mechanical engineer supervise the toolroom, machine shop, and tap manufacturing department, and that the chief construction engineer directly supervise the powerhouse and all maintenance departments. Petitioner accomplished these changes in February 1939. Shortly thereafter petitioner reduced the overall operating expenses of these departments by approximately $8,000 per year through layoffs, transfers, and reduction in working hours per week.

During their survey, the consultants, concluding that at petitioner's existing sales level many indirect and nonproductive factory groups were overmanned, recommended the layoff or transfer of a number of employees. Based on this recommendation, in March and April 1939, petitioner reduced indirect and nonproductive payroll by 72 employees at an estimated saving (based on 2,000 hours per year) of $82,500.

During their survey the consultants recommended a change from generation of electric power to purchase from outside sources. They considered cost savings, amortization of large expenditures for new power equipment, and technical questions of power factor control. The Cleveland Electric Illuminating Company, hereafter referred to

as Electric, submitted a report on April 10, 1939, listing the advantages of purchased power. In May 1939, petitioner contracted with Electric for the supplying of electric power. Electric estimated annual cost savings of $7,500 to $9,000.

In April 1939, the consultants recommended a change in the organization of the purchasing department to effect estimated annual savings of approximately $1,900. By July 31, 1939, petitioner had accomplished part of the recommended change at estimated annual savings of $1,300.

The consultants estimated the total annual cost savings to result from recommended changes, most of which petitioner actually put into effect prior to December 31, 1939, to be $166,000.

Prior to 1929, the industry of which petitioner was a member manufactured most fastener products by a machining process which involved the selection of a metal bar of a shape (round, square, or hexagonal) and diameter substantially equivalent to that of the head of the fastener. From this bar, machining removed metal to form the shank. A screw machine shaved off all excess metal on the shank of the bar previously cut to the desired length. This process wasted substantial metal in the form of shavings. Following this process trimming, pointing, and threading machines performed their respective functions.

Beginning in 1929, petitioner and other members of the industry developed a process known as "cold heading" or "upset." This process feeds wire of the diameter of the desired shank into a machine which cuts it to the required length, and hammers one end of the wire to form the head of the fastener. A trimming machine then trims the head to the desired shape (round, square, or hexagonal). This process wastes very little metal. The shank is then extruded and a thread rolled on, so that the thread and shank diameters are the same. The more economical upset process can produce all types of bolts, cap screws, machine screws, and similar fasteners, except the larger sizes.

In 1934, the industry developed a revolutionary machine called the "boltmaker" to manufacture bolts, cap screws, and machine screws by the upset process. This one machine performed the four successive manufacturing steps (heading, trimming, pointing, and threading) previously performed separately on 4 different machines. Petitioner purchased 2 boltmakers in each of the years 1937 and 1938. The new management purchased 2 additional boltmakers in 1940.

In 1934 high-speed heading equipment, 100 per cent faster than the old type, became available. Two of petitioner's competitors had begun to install this new equipment before petitioner acquired, in the latter part of 1936, its first high-speed header. Petitioner acquired 3 more in 1937 and 6 in 1938. At the beginning of 1936, petitioner had 200 to 250 old-type headers. Petitioner acquired at least 11 additional

high-speed headers in 1940 following orders placed by the new management late in 1939 and early in 1940.

The new management in 1939 found much plant equipment out of date, and petitioner behind its competitors in the installation of modern, automatic high-speed equipment. Early that year, it requested recommendations from petitioner's chief engineer with respect to replacing old equipment and from those recommendations it worked out a program for modernization to speed up production per man-hour and decrease costs. In 1939, it ordered, in addition to high-speed headers, automatic roll threaders and other items, some of which it received in 1939 and others in 1940.

Petitioner, during the base period, operated a wire mill about a mile from the main plant. During and subsequent to the base period petitioner used chiefly steel as new material, although it used some brass and copper. At the wire mill petitioner tested for quality the steel rods purchased, cleaned and drew the rods through dies to form wire of the diameter proper for the various products. It then rolled the wire into coils and transported it to the main plant. When required, petitioner annealed and hardened the wire at the wire mill.

Following the recommendation of the chief engineer, the new management purchased in 1939 one new Vaughn wire drawer and welding equipment which it installed early in 1940. The new Vaughn machine permitted faster and more economical wire drawing. Welding the ends of successive wire draws together permitted larger coils of wire to be formed and utilized in the main plant.

In 1939, Ladds, together with Newpher, surveyed and investigated petitioner's existing sales policies and activities. Ladds believed Newpher fully understood the sales situation confronting petitioner. Petitioner held only one general sales meeting through 1939, and that was in 1938 at Newpher's instance. Some salesmen had not visited the plant in years. Petitioner had made no effort to familiarize them with the full line of its products or its capability of producing special products for a customer's particular requirements.

The new management inaugurated the policy of educating petitioner's representatives and salesmen, held sales meetings at the plant, acquainted the salesmen with the full line of products and technical services, coordinated the operations of the manufacturing and sales departments, and directed a concentration of sales activities on those products and in those channels of distribution with higher potential profit. It employed additional sales representatives in the southern areas of the United States where petitioner previously had little or no representation. It rearranged and reassigned sales territories. Petitioner's new management encouraged each sales representative to promote the full line of its products.

Prior to and during the base period petitioner classified its sales into the following primary categories, according to the business of the customer:

(a) *Automotive Sales*
Manufacturers of automobiles, trucks, automotive parts and equipment;

(b) *Sales to Jobbers*
Hardware and other wholesalers supplying local manufacturers and users;

(c) *Chain Stores and Mail Order Sales*
Concerns selling fasteners at retail, through chain stores or by mail;

(d) *Electrical and Household Appliance Sales*
Manufacturers of electrical equipment, including household appliances whether or not electrical;

(e) *Industrial Sales*
Sales to other industrial manufacturers;

(f) *Other Sales*
Export, to competitors, and miscellaneous.

Ladds and Newpher early in 1939 concluded that petitioner had concentrated its sales efforts too heavily upon automotive business, which carried a lower profit margin, and not enough on jobbers and industrial concerns, sales to whom normally carry a larger gross profit margin. They also concluded that special products—manufactured to the customers' requirements and not generally sold through regular trade channels—offered opportunities for increasing sales and profits. Special products normally carry a higher sales price.

The new management adopted in 1939 sales policies conforming to the foregoing conclusions. Newpher intensified his activities, and Ladds, beginning late in 1939, personally called on jobbers and manufacturers with whom he had been previously acquainted.

Shortly prior to the base period Phillips Screw Company, hereafter referred to as Phillips, developed a new type of screw known as Phillips recessed head screws or Phillips screws. They embodied inventions covered by United States Letters Patent issued to Phillips.

Early in 1937, at the suggestion of Fisher Body Division of General Motors Corporation, hereafter referred to as Fisher, petitioner undertook to procure a license to manufacture Phillips screws. On December 1, 1937, petitioner obtained a sublicense from American Screw Company, hereafter referred to as American, holder of the exclusive license from Phillips, to manufacture and sell in the United States Phillips screws, bolts, and kindred products, and any improvements thereon. Prior to 1937, only American in the United States manufactured and sold Phillips screws.

The head of the Phillips screw contains a driving slot in the shape of a cruciform notch, the opening being somewhat narrower than the interior width. It requires a special screwdriver, also developed by

Phillips. Because of its construction the Phillips screw prevents slippage of the screwdriver, permitting faster driving, and can be used where a conventional screw cannot be driven. The Phillips screw and driver being self-centering, the screw is automatically driven straight. The Phillips screw has a more decorative appearance than the conventional screw.

The automotive industry considered the Phillips screw a new product. During the base period the engineering departments of petitioner's automotive customers worked with petitioner in developing the use of Phillips screws. The Phillips screw opened up new fastening methods.

Petitioner began to manufacture Phillips screws late in 1937. It confined its sales of Phillips screws during the base period primarily to the automotive industry. Later the Phillips screw began to acquire wide acceptance in the electric appliance, furniture, and other industries. During 1938 and 1939, petitioner promoted the sale of Phillips screws. Both American and petitioner, separately and jointly, advertised Phillips screws. The advertising of Phillips products by petitioner and other manufacturers thereof increased in 1938 and 1939.

At the end of each of the following years, American had the following number of nonexclusive sublicensees (including petitioner) to manufacture "Phillips Products":

| 1936 | None | 1939 | 10 | 1941 | 18 |
| 1937 | 4 | 1940 | 17 | 1942 | 19 |
| 1938 | 8 | | | | |

The total sales of Phillips screws by American and its sublicensees, including petitioner, and by petitioner in 1934 through 1939 are as follows:

| Calendar year | Total sales of Phillips products | Petitioner's sales of Phillips products | Percentage of petitioner's sales to total sales |
|---|---|---|---|
| 1934 | $9,200.00 | | |
| 1935 | 31,000.00 | | |
| 1936 | 281,920.63 | | |
| 1937 | 329,697.33 | $2,324.38 | 0.28 |
| 1938 | 667,981.07 | 57,820.25 | 8.66 |
| 1939 | 1,700,896.29 | 177,929.12 | 10.46 |

When petitioner commenced the manufacture and sale of Phillips products many of its customers were switching from standard slotted head products to Phillips products. If petitioner had not manufactured and sold Phillips products it would have lost slotted head product sales to the extent that its customers switched from those to Phillips products. To the extent that customers switched from purchasing slotted head to Phillips products, sales of Phillips products replaced sales of slotted products.

The sublicense agreement between American and petitioner authorized American to set minimum prices and terms but it had to establish such prices and terms uniformly for all entitled to use the patents, including itself. Pursuant to that authority, American issued price lists to its sublicensees under the Phillips patents.

Petitioner did not determine its selling prices for Phillips products in the same manner as its selling prices for other products. Petitioner's salesmen received Phillips prices from the assistant sales manager in charge of technical sales. Although the latter supervised sales of specialty items and patented products, he did not determine the prices of Phillips products.

In 1947, the United States of America filed a complaint in the United States District Court for the Northern District of Illinois (Civil No. 47C147) against Phillips, American, petitioner, and others, under the Sherman Act. The complaint alleged that subsequent to 1933 the defendants unlawfully combined and conspired to restrain trade in cross-recessed head screws and drivers.

The complaint cited unlawful acts including that American controlled prices on Phillips screws by preparing price schedules, schedules of quantity and other discounts, and sales terms and conditions designed to equalize prices without regard to the licensed manufacturer actually supplying the screws; that American and the other defendants reviewed and revised the established prices, terms, and conditions, and that they agreed to adhere to the price schedules; that the various manufacturers exchanged cost data to establish mutually satisfactory prices and they all agreed to adhere to prices which would return a satisfactory profit to the least efficient manufacturer; that American actually prepared the agreed price schedules for issuance by Phillips; that the manufacturers agreed to quote to the automobile companies prices obtained from American's established "large automotive list"; and that similar arrangements applied to prices quoted to airplane manufacturers.

On March 28, 1949, the District Court entered a Final Judgment with the consent of the parties without trial or adjudication of any issue of fact or law, and without admission by any party in respect of any issue. The judgment directed in part that:

### III.

A. Each defendant is hereby enjoined * * * from * * * entering into, * * * or maintaining any * * * arrangement among themselves or with any other manufacturer of Cross-recessed Head Screws * * *:

(1) to fix * * * prices or other terms or conditions of * * * initial sales or * * * resales;

(2) to allocate customers, markets, sales quotas or territories;

(3) to limit or prevent imports * * * or exports * * *;

(4) to limit production through quotas or otherwise;

(5) to restrict sales; or

(6) to refrain from manufacturing any type of Cross-recessed Head Screw * * *.

B. Each defendant is hereby enjoined * * * for * * * three years * * * from:

(1) publishing any price list specifying * * * resale prices on Cross-recessed Head Screws * * *; and

(2) by any other means * * * unilaterally * * * attempting to * * * regulate the price or terms or conditions * * * at which any person other than itself sells Cross-recessed Head Screws * * *.

C. Each defendant is hereby enjoined and restrained from * * * quoting or charging domestic prices for Cross-recessed Head Screws * * * on any basis other than (1) F.O.B. at the * * * origin of shipment * * * or (2) on a basis, which at destination at no time shall be higher than * * * F.O.B. price plus actual transportation and other delivery charges, with every purchaser having an option to purchase F.O.B. at the * * * origin of the product.

### IV.

A. Each of the license agreements between American and * * * the defendants * * * is hereby cancelled * * *, provided, however, * * * rights to monetary payments * * * accrued * * * shall be unimpared [sic] by * * * this judgment.

B. Phillips and American are hereby severally enjoined * * * from * * * enforcing * * * any license agreement * * * with any person not a defendant herein (1) prohibiting export or sale for export, (2) relating to selling prices or other terms or conditions of sale, (3) preventing or impeding the manufacture, use or sale of screws * * * other than those manufactured pursuant to said agreements, or (4) inconsistent with * * * Section A of Article III of this judgment.

Sales to automobile makers being highly competitive, petitioner granted special discounts to automobile manufacturers to secure their business but never cut its prices on Phillips products. With free competitive conditions the price of Phillips products eventually would have come down, and petitioner's profit margin, consequently, would have eventually been lower.

Had both the change in management and the commencement of the manufacture of Phillips screws occurred 2 years before they did occur, petitioner's sales volume of Phillips screws by the end of the base period would have been substantially increased.

Late in 1938, petitioner developed and commenced to manufacture a product known as lock washer assemblies, consisting of bolts and screws to which it attached lock washers in place. Petitioner later received two patents on methods of producing lock washer assemblies. The method first used by petitioner created a shoulder or ridge by the upset method on the shank under the screw head, then rolled the thread on the shank, finished the item and then pressed a washer over the shoulder by friction. The washer could not become disassembled from the screw in transit or in handling. Petitioner installed the first machine designed to produce the "pressed-on" lock washer assemblies in September 1938.

Petitioner developed the manufacture of lock washer assemblies through cooperation with the engineering department of Fisher. Fisher encountered difficulty on its assembly lines in getting lock washers attached when a fastener was inserted in the car body, due to problems of placing a separate washer on the fastener in the assembly line process. Fisher advised petitioner's assistant sales manager that Illinois Tool Works, hereafter referred to as Illinois, was also developing a product to remedy the situation.

Petitioner built special machines to produce pressed-on lock washer assemblies. Manufacturing the pressed-on assembly was a slower process than making standard products.

Petitioner sold "pressed-on" lock washer assemblies during 1938 and 1939 as follows:

| Month | 1938 | 1939 |
|-------|------|------|
| January | | $3,663.86 |
| February | | 2,825.35 |
| March | | 3,741.00 |
| April | | 7,158.11 |
| May | | 6,541.73 |
| June | | 5,459.46 |
| July | | 5,493.04 |
| August | | 13,092.36 |
| September | | 5,842.48 |
| October | | 15,366.54 |
| November | $7,718.92 | 20,582.18 |
| December | | 17,689.98 |
| | 7,718.92 | 107,456.09 |

When petitioner commenced the manufacture and sale of pressed-on lock washer assemblies, regular customers switched from standard products to pressed-on lock washer assemblies.

Illinois developed a lock washer assembly which performed the same function as the pressed-on type lock washer assembly, but which it made by a different process. This process headed the fastener, placed the lock washer on the fastener shank and rolled on the thread. The thread prevented the washer from sliding down the shank. This rolled-on type lock washer assembly was preferable to the pressed-on types because the washer revolved freely on the shank and would avoid marring the finish under the fastener head.

On November 30, 1939, petitioner acquired a nonexclusive license from Illinois to manufacture and sell rolled-on type lock washer assemblies, called Sems, under patents owned by Illinois.

Petitioner first produced rolled-on type lock washer assemblies in December 1939. It first sold Sems type lock washer assemblies in May 1940.

Petitioner and its industry regarded lock washer assemblies as a new type of product, as did users of the product.

During the last quarter of 1939, petitioner's sales of lock washer assemblies reached an annual rate of approximately $215,000. Had petitioner commenced production 2 years before it did, its annual sales of such product would have been above that figure.

When petitioner commenced the manufacture and sale of rolled-on assemblies, regular customers switched from standard products to rolled-on assemblies. To the extent those customers switched from purchasing standard products to rolled-on assemblies, petitioner's sales of rolled-on assemblies replaced sales of standard products.

The changes in the character of petitioner's business occurred too late in the base period for petitioner to reach by the end of the base period the level of earnings it would have reached had it made such changes 2 years earlier. The new president took over March 1, 1939, but petitioner made or put into effect other changes in management personnel, in sales policies, and in plant facilities, procedures, and methods progressively during the balance of 1939. It did not fully complete some until early in 1940. The combined efforts of Ladds and Newpher and their changes in sales policies and personnel increased petitioner's sales to most classifications of customers.

Had petitioner made all qualifying changes 2 years earlier, petitioner would have reached by the end of the base period a total sales volume substantially above that actually achieved.

In its income and excess profits tax return for 1939, petitioner deducted $2,000 of a capital loss on the sale of plant property and equipment in excess of capital gains realized in that year. Petitioner derived the following rental income during the base period from the property sold in 1939:

|  | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| Gross rental | $7,856.94 | $8,250.00 | $8,630.00 | $7,160.38 |
| Expense, taxes, etc | 8,410.26 | 7,118.93 | 6,348.49 | 5,821.75 |
| Net | (553.32) | 1,131.07 | 2,281.51 | 1,338.63 |

In 1939, petitioner paid to the management consultants $37,492.54 as fees and expenses for making the survey completed by them in that year. Petitioner incurred the following additional nonrecurrent expenses or losses in 1939, which its profit and loss statement and income tax return for 1939 reflected:

Separation pay to officers and employees _____ $26,422
Factory rearrangement expense _____ 12,623

Total _____ 39,045

Petitioner is entitled to compute its excess profits tax liability for each fiscal period involved under section 722.

A fair and just CABPNI in the computation of petitioner's excess profits tax liability under section 722 is $465,000 for the calendar year 1940 and $475,000 for the fiscal years ending November 30, 1941, to November 30, 1945, inclusive.

OPINION.

Petitioner claims relief under section 722(b)(4), I.R.C. 1939, contending that the character of its business changed during the base period and the average base period net income therefore does not reflect the normal operations of petitioner's business with its changed character. Petitioner contends that it qualifies for relief by virtue of (1) a change in management, and (2) the introduction of new products.

The former president, first vice president, second vice president, secretary, controller, superintendent, and assistant superintendent, as well as 7 of the 10 directors serving in 1937 were no longer with petitioner by 1939 or in 1940 pursuant to the program established in 1939.

It is undoubtedly true, as respondent contends, that the change was preceded by bitter factionalism existing within the corporate structure; however, we believe that sort of underlying cause should not necessarily disqualify a taxpayer from relief, especially where, as here, there is much credible evidence of inefficiency and bad business practices on the part of the old management. As we stated in *Blum Folding Paper Box Co.*, 25 T.C. 721, 725 (1956):

The statute imposes no conditions as to the underlying causes for the qualifying changes. It is the importance of the changes and their effect upon the taxpayer's independent business with which the statute is concerned.

The record contains considerable credible evidence that the old management did not conduct petitioner's affairs in the aggressive and progressive manner to be expected of competent management. Among the missed opportunities and wasteful practices it tolerated were inefficient product washing arrangements, poor control of maintenance crews, uneconomic storage and packing arrangements, excessive intraplant product transportation, topheavy supervisory staff, ineffective relations with salesmen, failure to promote higher-profit sales, and failure to exploit petitioner's ability to make special products to customers' orders.

The new management substantially changed the character of petitioner's business by reassigning department heads and redelegating responsibilities, relocating plant departments, reorganizing factory procedures and methods, reducing plant payroll, especially indirect labor, renewing emphasis on equipment modernization, establishing closer relations with sales representatives, promoting sales of products with

higher potential profit, promoting sales in new markets, realigning sales territories, and by generally rejuvenating the entire operation, as more fully indicated by our findings. Any one or even several of these changes together might be regarded as mere routine progress to be expected in any successful operation. However, the cumulative effect of this major revision in virtually all departments must be regarded as a true change in character.

The change in management was accompanied by a substantial improvement in petitioner's operating results in 1939. Comparisons of the net loss before taxes figures for 1939 and 1938 show that the 1939 loss was only about one-fourth as large as the 1938 loss. We are, of course, cognizant that the economic situation of industry in general, as well as the specific industry to which petitioner belonged, improved measurably in 1939, however, the statistics cited by respondent to account for this factor do not equal the improvement which petitioner achieved.

After eliminating the increased sales and earnings attributable to general economic recovery by means of the more dependable indices, it appears that petitioner's business still showed some improvement in nearly all categories of sales and great improvement in several.

The change in petitioner's management in 1939 constitutes a qualifying change in character. Relief under section 722 is warranted.

Petitioner also argues that the introduction of Phillips recessed head screws and lock washer assemblies constitutes a qualifying change calling for relief. Respondent contends that these items are either mere improvements or temporary products, and in any event, that they are too insignificant a factor with respect to both earnings and sales to be regarded as substantial changes in the character of petitioner's business. Cf. *Davenport Hosiery Mills, Inc.*, 28 T.C. 201; *Bardons & Oliver, Inc.*, 25 T.C. 504; *Charis Corporation*, 22 T.C. 191; *W. J. Voit Rubber Corp.*, 20 T.C. 84.

These alleged changes in product occurred contemporaneously with the change in management already discussed and since we have already decided that petitioner's management change qualifies it for relief we do not reach these further questions.

Although we have approved petitioner's claim of a change in character of its business, we find its proposed reconstruction of earnings excessive. Aware of the weaknesses in petitioner's reconstruction, we have thoroughly studied the entire record and all arguments presented in an effort to establish a reasonable and logical level of earnings which petitioner should have attained if its qualifying change in management had occurred 2 years earlier than it did. In addition to compensating for the weaknesses in petitioner's reconstruction indicated above, the economic trends of the industries to which petitioner sold its prod-

ucts have been considered, as well as petitioner's cost trends, ratios of expenses to sales, and other factors affecting a projection of earnings based on the improvement in earnings achieved by the new management within its short regime during the base period. As there was no adjudication of any fact or law in the antitrust proceedings involving Phillips products, we have not adjusted petitioner's earnings to eliminate allegedly unlawful profits from sales of those products. Cf. E.P.C. 10, 1947–1 C.B. 78. However, petitioner has failed to supply convincing proof that the profit margin on new products was as high as claimed, and we have made adjustments accordingly. After full consideration of the entire record we hold that petitioner is entitled to relief under section 722 and that it is entitled to use a CABPNI of $465,000 for the calendar year 1940 and $475,000 for the fiscal years ending November 30, 1941, to November 30, 1945, inclusive. The amount determined for 1940 results from the application of the variable credit rule which is appropriate in this case.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*