NAPCO INDUSTRIES, INC., (SUCCESSOR TO TERRE HAUTE BREWING CO., INC., BY STATUTORY MERGER), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 39066.   Filed May 9, 1958.

*Milton E. Carter, Esq.*, and *Peter L. Wentz, Esq.*, for the petitioner.
*Lyman G. Friedman, Esq.*, and *R. G. deQuevedo, Esq.*, for the respondent.

OPINION.

TRAIN, *Judge:* The petitioner claimed refunds of excess profits taxes under section 722 [1] as follows:

| Year ended Oct. 31 | Excess profits tax refund claimed |
|---|---|
| 1941 | $61,892.91 |
| 1942 | 162,913.77 |
| 1943 | 48,953.43 |
| 1944 | 38,470.88 |
| 1945 | 9,564.33 |
| 1946 | 7,124.00 |

[1] All section references hereinafter refer to sections of the Internal Revenue Code of 1939, unless otherwise specified.

The respondent denied the relief claimed, and determined excess profits tax deficiencies, payment of which had been deferred under section 710 (a) (5) for the years and in the amounts as follows:

| Year ended Oct. 31 | Excess profits tax |
|---|---|
| 1943 | $67, 392. 20 |
| 1944 | 71, 921. 38 |
| 1945 | 68, 266. 90 |
| 1946 | 11, 697. 36 |

The petitioner's application for relief under section 722 (c) was waived at the hearing. Petitioner's original application for relief was based on section 722 (b) (4) and was accompanied by a statement of supporting facts. In amending its application, the petitioner alleged it was also entitled to relief under section 722 (b) (2) and (b) (5), relying on the facts set forth in the original application. The petitioner, on brief, has not argued the merits of its claims under (b) (2) and (b) (5). The facts relied on by the petitioner offer only the most remote support of the claim under (b) (2) and, assuming that the issue raised by this claim is properly before the Court, the claim is disallowed for failure of proof. The facts relied on for (b) (5) relief are the same facts which allegedly establish two qualifying factors under (b) (4). The petitioner has not alleged that "any other factor" is present, and its claim under (b) (5) is not sustainable. *Clermont Groves, Inc.*, 17 T. C. 1616 (1952). Therefore, the only issue before the Court is whether the petitioner qualifies for relief under section 722 (b) (4).

The evidence in this case was presented before a commissioner of this Court; he made findings of fact based upon stipulations and the record. The findings of fact were served upon the parties; both parties proposed additions to the findings and the respondent made some objections to the findings. Only several minor additions to the findings are necessary, and those findings with these additions are hereby adopted by the Court as the findings of fact.[2] The additional findings referred to in the preceding sentence are as follows:

Breweries often call in consultants to recommend beer formula changes to maintain and improve consumer acceptance of their product.

The same ingredients were used in petitioner's new beer as in its previous products and the same general brewing process was used. No changes were made in the brewing equipment or plant to produce the new beer. Petitioner's new beer was a light pilsener-type popular-priced beer as was its previous product, "Champagne Velvet."

---

[2] In paragraph 39 of the report of the Commissioner, the figure of $0.261 should have been in parenthesis to show a net loss per barrel for fiscal year 1940, and is hereby so corrected.

Terre Haute Brewing Co., Inc., a corporation, was organized under the laws of the State of Indiana on January 17, 1933, with its principal office and place of business at Terre Haute, Indiana, and is and has been since March 17, 1934, actively engaged in the manufacture and sale of malt beverages. Since October 31, 1935, it has maintained its books on a fiscal year ending October 31. On July 23, 1957, Terre Haute Brewing Co., Inc., merged with Napco Industries, Inc., and the former corporation ceased to exist. The term "petitioner," as hereinafter used, includes Terre Haute Brewing Co., Inc.

Petitioner, as grounds for relief under section 722 (b) (4), contends that it commenced business immediately prior to, and changed the character of its business during, the base period.

In the fall of 1933, petitioner acquired a property located in Terre Haute, Indiana, which had been used as a brewery prior to national prohibition. For a temporary period during prohibition, the property was used for the production of malt, nonalcoholic malt beverages, and soft drinks, but, in or about 1926, it was closed. Petitioner completely rehabilitated the property during the period from about October 11, 1933, to March 17, 1934, at which time it began the active production and sale of malt beverages. Although the plant was put into good operating condition, it was not comparable to a new plant.

Petitioner's principal officers, prior to and during the base period, were inexperienced in the brewery business when first employed by the petitioner. However, the petitioner's first brewmaster, Otto Faenhle, had over 20 years' experience, and the first Champagne Velvet brewed by petitioner was from a formula supplied by Faenhle. Barley malt, corn flakes, hops, water, a chill-proofing powder, and yeast were the principal ingredients in this formula. The trade complained about the beer being bitter, and Faenhle was discharged on or about May 1, 1934, when he refused the management's request to change the quality of the beer.

Petitioner's second brewmaster, John Bloehme, had long experience in the brewery industry. Bloehme used the same basic ingredients in brewing beer as had Faenhle, but he lowered the temperature at which the brew was fermented, lengthened the period of fermentation, and added certain chemicals as a water corrective.

For the 10 months ended December 31, 1934, petitioner's net sales and net income before income taxes amounted to $1,530,075.15 and $26,793.90, respectively. For the 10 months ended October 31, 1935, petitioner's net sales and net income before income taxes amounted to $3,931,481.20 and $309,858.23, respectively. For the taxable years 1936 to 1940, inclusive, petitioner's operations at its Terre Haute plant showed net sales and net income before income taxes (or loss) as follows:

| Year ended Oct. 31 | Net sales | Net income (or loss) |
|---|---|---|
| 1936 | $5,888,962.03 | $645,912.72 |
| 1937 | 3,868,040.98 | 135,142.23 |
| 1938 | 2,100,858.82 | (127,184.35) |
| 1939 | 2,024,793.78 | (44,738.49) |
| 1940 | 2,774,151.86 | 9,595.02 |

Encouraged by its success in fiscal year 1935, petitioner, in December 1935, began acquiring the controlling stock interest of the A. B. C. Brewing Corporation of St. Louis, Missouri, expecting to operate its new brewery at a profit. Early in 1937, petitioner had completed its purchase of the assets and the business of A. B. C. The St. Louis brewery venture proved unprofitable and that plant was closed down entirely in early 1938 after less than a year's operation. It was maintained thereafter in condition to permit resumption of operations.

Considering the petitioner's high earnings level in the fiscal years 1935 and 1936 when conditions in the brewing industry were chaotic, petitioner has failed to show that the fact that it did not commence business until March 1934 resulted in its average base period net income not reflecting the normal operation for the entire base period of the business. Nor has it been shown that the petitioner would have reached a higher earnings level by the end of the base period had it commenced business 2 years earlier than it did. See *Acme Breweries*, 14 T. C. 1034 (1950).

Initially, management attributed the decline in petitioner's sales during its 1937 fiscal year to unfavorable weather conditions and a general decline in business activity. There were additional factors, however, which contributed to petitioner's declining sales in fiscal 1937 and the continued decline thereof in fiscal 1938 and 1939. Some of these factors were keener competition from national brands, petitioner's inability to compete successfully with St. Louis breweries and other local breweries in their home areas, Indiana's restrictive legislation, changes in consumer tastes, and the lack of consumer appeal for petitioner's beer.

In September 1938, Bloehme was discharged because he could offer no suggestions on how to remedy the lack of consumer acceptance of petitioner's beer that had developed in 1937 and 1938. Bloehme thought the beer was all right and refused to admit that there was anything wrong with it. R. P. Harris, initially plant superintendent and later vice president in charge of production, succeeded Bloehme as brewmaster.

Initially, petitioner sold its beer in a trade territory embracing certain counties of Indiana and part of Illinois. Beginning in March 1934, petitioner expanded its trade territory and by the end of the fiscal year 1936, it was selling beer in 22 different States. During

the fiscal year 1936, petitioner sold about 27 per cent of its beer in States west of the Mississippi River. After 1936, sales in these States declined steadily and in 1940 accounted for only 2.6 per cent of petitioner's total sales in that fiscal year. One reason for the steady decline of its sales in States west of the Mississippi River was petitioner's inability to compete with breweries in St. Louis and elsewhere for this trade. The management decided that rather than put a smattering of beer in a lot of areas they would concentrate their efforts on selling in areas where petitioner could compete on a more nearly even basis. Geographically, the latter trade areas were parts of Illinois, Michigan, and Kentucky, plus the States of Indiana, Tennessee, Alabama, Georgia, and Mississippi. Petitioner's sales in these 8 States accounted for 85.9 per cent and 89.7 per cent of its sales in the fiscal years 1939 and 1940, respectively. During the fiscal year 1939, petitioner acquired an energetic distributor in Florida who accounted for 6.2 per cent and 6.5 per cent of petitioner's sales in the fiscal years 1939 and 1940, respectively.

In or about July 1938, petitioner engaged Schwarz Laboratories, Inc., of New York City, a firm of brewery consultants, to survey the situation. After a survey and inspection of petitioner's plant, Schwarz Laboratories in a preliminary report dated August 15, 1938, recommended changes in petitioner's brewing procedure as follows:

(a) Water treatment to secure a definite acidity of brewing water;

(b) Increase in quantity of malt used and a decrease in corn flakes;

(c) A reduction in the amount of water used and changes in mashing procedure;

(d) An alteration in kettle procedure with time schedule for adding hops;

(e) Change fermentation procedure from closed fermenters to 50 per cent open fermenters which would permit skimming of "dirt cover", resins, and other undesirable matter.

Petitioner followed the recommendations of Schwarz Laboratories except for the recommended change in its fermentation procedure. No changes in its physical equipment resulted from following such recommendations, but the method of processing was altered, the beer was aged longer, and less beer was produced. Schwarz Laboratories estimated that the adoption of its recommendations might cost petitioner as much as 5 cents per barrel, but that such costs might be recovered through increased yields by correct water treatment and modified mashing procedure.

After making the changes in method, process, and formula recommended by Schwarz Laboratories, petitioner produced a beer of different character and quality. It had an improved flavor, a different taste, and was more palatable. It was uniform and stable, biologically and chemically, which had not been always true of beer made under the old formula. It was described by one of petitioner's competitors as a "lighter, pale, mild, smoother-drinking bottle of beer."

Petitioner advised its sales force and its distributors that it was producing a different and better beer. However, petitioner was unable to convince the consumers in its trade territories that its Champagne Velvet beer had been improved and was a better beer. Petitioner, therefore, changed the name and label of its product from Champagne Velvet to Champagne Velvet Gold Label. Petitioner had used this brand name previously in marketing a very small amount of its beer as a premium beer. Early in 1939, petitioner began introducing its Champagne Velvet Gold Label beer in market after market. Consumers liked the beer and repeated their purchases with the result that petitioner's sales improved.

Petitioner's basic advertising theme during the period from February to June 1939 was, "Now you can buy a premium beer at a popular price." In the summer of 1939, an advertising agency suggested an advertising campaign based on the idea of insuring petitioner's Champagne Velvet Gold Label formula for a million dollars and advertising it as "The Beer with the Million Dollar Flavor." Petitioner accepted the idea, engaged the agency and launched an extensive advertising campaign based thereon.

A provision restricting the number of beer wholesale permits in the State of Indiana was repealed in 1939. Removal of this restriction enabled the petitioner to increase the number of its exclusive distributorships in the State and, along with the change in the quality of its beer, the adoption of the Gold Label, and its new advertising program, distinctly helped in building up its sales volume in Indiana.

In its contention that it changed the character of its business, the petitioner relies mainly on the improvement in the quality of its beer resulting from the adoption of the brewery consultant's suggestions. However, to be a change in the character of its business the change of product must be substantial; a mere improvement of a product, particularly in that type of business where the consumers' desires and tastes vary from time to time, making such improvements necessary, does not qualify as a change in product. See *Triangle Raincoat Co.*, 19 T. C. 548 (1952). Breweries often call in consultants to recommend beer formula changes to maintain and improve consumers' acceptance of their product and the petitioner has not proven that the changes it made in its brewing process were of a greater character and degree than the usual routine changes recommended by such consultants. The same ingredients were used in petitioner's new beer as in its previous product and the same general brewing process was used. No changes were made in the brewing equipment or plant to produce the new beer. Petitioner's new beer was a light pilsener-type popular-priced beer as was its previous product, Champagne Velvet. Undoubtedly, the improvement of its beer was a very important factor in the increase in petitioner's sales of fiscal year 1939, but there has

not been a change of product within the meaning of section 722 (b) (4). *A B C Brewing Corp.*, 20 T. C. 515 (1953) ; see *Triangle Raincoat Co., supra.* The cases cited by petitioner involve the addition of a new product distinctly different from the taxpayer's previous product, or are otherwise distinguishable.

The other changes relied on by the petitioner include the reduction in its trade area from 22 to about 9 States, adoption of the "Gold Label," and the undertaking of an ambitious advertising program. On the facts in the instant case, none of these changes constitutes a change in the character of the business within the meaning of (b) (4). Further, the evidence fails to show to what extent earnings were increased by such changes and, therefore, that relief granted on such grounds would be greater than that resulting from use of the excess profits credit computed under the invested capital method pursuant to section 714.

Petitioner relies on *Crowell-Collier Publishing Co.*, 25 T. C. 1268 (1956), in asserting that the discontinuance of operations at the St. Louis plant entitled it to relief under (b) (4). This contention cannot be sustained. In *Crowell-Collier Publishing Co.*, the discontinued, losing magazine had been published throughout the base period until late in 1939, while in the instant case the St. Louis plant was in operation for less than a year. Further, the evidence again fails to show that relief granted on such a ground would be greater than that already obtained.

We have carefully considered all of the petitioner's arguments, but find that the record does not disclose the presence of any factors qualifying the petitioner for relief under section 722 (b) (4). In the absence of any qualifying factor under (b) (4), we need not decide whether the 2-year push-back rule would be applicable. Petitioner's excess profits tax computed without the benefit of section 722 does not result in an excessive and discriminatory tax.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*