## A. Finkl & Sons Company, Petitioner, v. Commissioner of Internal Revenue, Respondent.

Docket No. 44728. Filed September 19, 1962.

*Carl J. Batter, Esq.*, for the petitioner.
*John W. Holt, Esq.*, for the respondent.

Forrester, *Judge:* Respondent has denied petitioner's application for relief under section 722 [1] for the year 1944 in the amount of $844,206.73. The issues presented for our determination are: (1) Whether petitioner's plant rehabilitation and modernization program was an event "unusual in the experience of the taxpayer" within the

---

[1] Unless otherwise noted, all Code references are to the Internal Revenue Code of 1939.

meaning of section 722(b)(1) or increased petitioner's "capacity for production" within the meaning of section 722(b)(4); (2) whether petitioner or the industry of which it was a member was depressed due to temporary economic events during the base period within the meaning of section 722(b)(2); and (3) whether changes in management personnel constituted a "change in management" within the meaning of section 722(b)(4).

FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

I. <em>Background.</em>

A. General.

Petitioner is a corporation incorporated under the laws of the State of Illinois in 1902. It kept its books and filed its income and excess profits tax returns on a calendar year, accrual basis for all years material hereto. Its income and excess profits tax returns for the taxable year 1944 were filed with the collector of internal revenue for the first district of Illinois.

In computing its excess profits credit for 1944, petitioner employed the invested capital method (sec. 714). Under such method its credit is $313,142.48. Under the income method (sec. 713) its credit would be $298,849.[2]

Its excess profits net income for each of the base period years is as follows (adjusted to reflect revenue agents' changes):

| | |
|---|---:|
| 1936 | $267,784.49 |
| 1937 | 451,033.42 |
| 1938 | 8,945.85 |
| 1939 | 287,831.33 |
| Aggregate | 1,015,595.09 |
| Average | 253,898.77 |

B. Products and Operations.

Petitioner is the leading die block manufacturer in the world. It engages in the manufacture of die blocks for the drop-forge industry, the automobile industry, and for other large manufacturers and railroads maintaining drop-forge equipment. Its largest customer is the drop-forge industry. These die blocks are manufactured from alloy or carbon steel. The petitioner also produces commercial open

---

[2] This method produces a higher figure than the actual ABPNI ($253,898.77) because under section 713(e)(1) petitioner was permitted, in computing its credit based on income, to raise the earnings of the lowest base period year to an amount equal to 75 percent of the average earnings of the other 3 years. Such adjustment is not permitted when section 722 relief is granted and the taxpayer may use a credit based on CABPNI.

die and drop forgings, principally heavy forgings,[3] for a number of durable goods industries. It either partly or completely machines some of its production. Its customers are many and diversified; they cover the whole range of the metal-fabricating industries, and they include but are not limited to the automobile industry, the agricultural implements industry, the railroad industry, and the marine equipment industry. The petitioner does not manufacture its own steel or alloy steel but rather purchases it. The products of the petitioner are primarily secondary consumer products; that is, they are consumed by industries in the process of making goods and as such do not become a part of the consumer product.

Among the many methods of mass production used in modern durable goods industries there is none more important than those of drop forging and upsetting. By these two processes, which may both be referred to generally by the term "drop forging," it is possible to duplicate accurately metal parts of surprisingly intricate design in large quantities with remarkable speed. The method used generally consists of heating the metal to a plastic condition and forming it in dies which contain the desired shape in negative or mirror form. The dies are affixed or attached to drophammers in the case of drop forgings and in mechanical hydraulic forging machines in the case of upset work.

The die blocks after being forged are heattreated and rough-machined on the face and shank (opposite) sides and tested for proper hardness. The die block may become the petitioner's end product or it may be consumed by the petitioner as a finished die in making commercial drop forgings to its customers' specifications. The commercial forgings are heattreated by the petitioner and when machined are machined either rough or finished. If finished, extremely close tolerances are required and attained in the machine shop process.

In August 1923, William F. Finkl [4] (whose duties are more fully described below), then petitioner's chief metallurgist, obtained a patent on a steel-hardening process which he had perfected. The patent consisted of a carbon-chromium-nickel-molybdenum additive to the alloy steel from which the die blocks were made. William assigned the patent to petitioner who licensed certain steel companies,

---

[3] A heavy forging is for the most part formed on an open die by pressure exerted by a press and differs from a drop forging (normally referred to as a closed die)—which is made by the force of a dropped weight—in that the latter is formed between members having a cavity or a desired shape and are normally made to the customers' specifications. The open die forging process may be likened to the rough shaping of metal by a blacksmith on an anvil wherein the open die press becomes a gigantic mechanically actuated blacksmith's hammer; no impression or die is cut into the block. This is all preliminary to machining or further finishing. The rough shaping of the part is effected largely through the manipulation of the hot metal by a team of operators, cranes, and manipulators.

[4] All members of the Finkl family after being once identified shall be thereafter referred to by their respective first names.

including petitioner's suppliers and competitors, to make alloy steel under the patent. Under the licenses, the steel companies could not use the patent in the manufacture of steel for sale to die block customers other than petitioner. However, one competitor, Heppenstall Company (hereinafter referred to as Heppenstall) which also made steel was permitted to produce die blocks under the patent. Such permission was granted at the insistence of petitioner's customers who wanted to be certain that more than one source of supply for die blocks was available. The patent was very effective and resulted in the virtual elimination of competition from those who made die blocks from other types of steel.

At all times here relevant Heppenstall sold its products at prices identical to those of petitioner. Thus, the two companies generally competed on the basis of quicker delivery and more efficient service.

## C. Company History.

Anton Finkl founded what was to become the business of the petitioner in 1879, in Chicago, Illinois. Anton's three sons, Charles E., Fred, and Frank, assisted him in his business. Petitioner was incorporated in 1902 and acquired the business theretofore operated by Anton as an individual proprietorship.

The petitioner corporation has always been a closely held family corporation. Decisions have been made generally by a concerted, unanimous agreement of all the members. For the years material to this case it was both owned and managed by the Finkl family. Charles, son of Anton, held the controlling interest in the petitioner when he died on July 29, 1933. At the death of Charles his interest in the petitioner passed to his wife Elizabeth and his son William. Elizabeth Finkl died October 14, 1941, and at that time passed her remaining interest in the petitioner to her son William, who was then the president of the petitioner.

During the years 1936 through 1939 the petitioner had two operating plants designated as Plant No. 1 and Plant No. 2. Plant No. 1 was built in 1902 and by 1918 it had been enlarged to consist of a representative forge plant. During the years material to this case it could process blooms and billets up to 16 inches in cross section. Plant No. 2 was built in 1923–1924 and further expanded during the 1920's. Its facilities were much more extensive than those of Plant No. 1, which was limited to die blocks in size up to 12 by 18 by 20 (inches) ; Plant No. 2 would process blooms and ingots as large as 54 inches, round or square, having a maximum weight of 110,000 pounds. Production was directed to the two plants in accordance with the size of the steel required. Plant No. 2 did some finishing work for Plant No. 1, but fundamentally each plant was self-contained. Plant No. 1 produced die blocks, some commercial forgings (the heavier com-

mercial forging was produced in Plant No. 2), drop forgings, and alloy steel bars and rounds. Plant No. 3 was erected in 1940 and put into service in 1941. Plant No. 4 commenced operations in 1942.

Plant No. 3 was constructed because petitioner's management realized the need for an expansion in the machine shop and heat-treating departments in order to perform the anticipated orders from the United States Army, Navy, and Maritime Commission. This expectation was to prove fully justified. Such additional facilities were also required for the production of breech rings and blocks for various types of guns demanded by divers military units. In 1941 the United States War and Navy Departments issued certificates of necessity with respect to these facilities.

Plant No. 4 was erected at the instruction of the Industrial Planning Section of the United States Army Air Corps which required facilities for greater production of die blocks.

## II. Personnel Changes and Plant Rehabilitation Immediately Prior to and During Base Period.

### A. Personnel.

Anton was the founder of petitioner and served as its president until his death in 1938. In the early formative years he had complete managerial responsibility. As the size of the business increased and the production and financial problems became more complex, he gradually relinquished many of these duties. About 1923, Charles became general manager and assumed the major duties in the financial end of the business. His brothers, Fred and Frank, became active in management somewhat later but mainly in the production phase. Charles died in 1933 and thereupon his son William (the metallurgist) began to assume many of Charles' duties although Anton remained the titular head of the business.

During Charles' tenure as general manager plant modernization with a view to increased efficiency was undertaken at regular intervals, but the modernization programs in the 1920's were not as extensive as those undertaken later. Throughout the later years of Charles' administration all members of the family recognized the need for a complete overhaul of plant facilities. Many companies which competed with petitioner had begun improvement programs long before petitioner—e.g., manipulators (valuable labor-saving devices for handling heat-treated steel) were available to the industry as early as 1920 but were not installed by petitioner in significant numbers until 1936 as part of its overall plant rehabilitation which was begun in 1934.

At first, petitioner had postponed certain major changes because it did not feel that they were absolutely required by competitive

conditions and its fiscal policy was such that it refrained from making expenditures when not so necessary. However, the machining and degree of tolerances demanded by industry were steadily increasing, and when the need became more pressing (and was appreciated by the entire Finkl family) in the early 1930's, operating revenues were at a low ebb and a major overhaul was reluctantly postponed.

The decline in the business in the early 1930's occurred despite what all members of the Finkl family considered good and competent management by Charles. As business conditions began to improve in 1934 petitioner decided to put its plans into action, as is hereinafter more fully described.

When Charles died in 1933, Elizabeth and Anton (who had been in semiretirement) assisted William in his gradual ascension to a position of complete control. Thus for a period of 4–5 years after Charles' death, while William was emerging as the dominant voice in petitioner's affairs, petitioner was essentially a family-run business. William's uncles, Fred and Frank, were more conservative in nature than was William and hence William assumed the initiative in commencing plant rehabilitation in pursuance of the agreed program. Anton used his influence to persuade the others to accept William's suggestions. As William acquired more experience in management he began to assume his father's overall role in the business and as a leader in the industry and Anton retired from the scene.

### B. Plant Rehabilitation.

In 1934, the plant improvements commenced, the object being to improve operating efficiency and control in order to supply the better quality products which customers were demanding. In 1936, Plant No. 1 was razed and a more modern plant substituted. The major 1936 betterments were:

| Installation | Cost (approx.) |
| --- | --- |
| 1. Newer forging equipment (hammers and presses)[1] | $23,000 |
| 2. Cranes | 17,400 |
| 3. Manipulators | 42,100 |
| 4. Piping and furnaces | [2] 43,300 |
| 5. Modern cutting machinery | 3,200 |

[1] Old, outworn presses which cost $14,700 were discarded; a hammer costing over $4,300 was discarded in 1935.

[2] The cost of all the piping and furnaces installed in the period 1934–1940 was $98,900.

The cranes made possible a faster and more accurate movement of materials, thereby saving time in the forging operations. The new piping enabled a change from oil to gas furnaces, which change

permitted more initial combustion,[5] and afforded a cleaner heat. The new furnaces permitted better and faster heat treatment of the steel and superior temperature control. In conjunction with the manipulators which allowed for quick handling of the heated steel, petitioner was thereby able to give preliminary heat treatment to the steel before forging and reheating. The advantage of the whole process was that the problems of internal rupture and corner-cracking were largely eliminated.

The basic forging capacity was altered only slightly as a result of all these changes, for productive capacity in petitioner's plant is largely determined by the ability of the other processing departments to maintain a constant flow of materials to the forging units.

Whereas Plant No. 1 was virtually outworn by 1934, Plant No. 2 was then comparatively up-to-date. Numerous efficiency improvements were made thereafter to Plant No. 2, and by 1936 a 15-ton manipulator, gas-burning equipment for 11 forge furnaces, a series of heavy lathes, and several new precision milling machines had been installed. A number of lathes (to handle high-speed steels) and planers were added thereafter but the basic time and laborsaving machinery was in operation by 1936.

During the course of the renovation in Plant No. 1 in 1936, some of the larger orders ordinarily processed there had to be handled in Plant No. 2 on somewhat clumsier machines. The smaller orders were handled on machinery temporarily stationed in the back room of Plant No. 1. Petitioner rearranged its production schedule in this fashion so that it would not lose any of its existing customers. Thus, although Plant No. 1 was inoperative for about 6 months in 1936 (and was not fully operative for about 8 months) petitioner's sales remained at constant levels throughout all the months of 1936. Certain segments of petitioner's business continued in operation throughout the plant rehabilitation (e.g. drop forgings).

### III. *Industry Characteristics.*

While it is difficult to classify petitioner within any one specific industry, it is nevertheless possible to make certain generalizations concerning the nature of petitioner's business.

Petitioner supplies what may generally be termed the "durable goods" or "basic" industries as distinguished from the consumer "perishable" goods industries. As a rule therefore it experiences an increase in orders received before there is a corresponding upturn in orders by the consumer goods industries; likewise, there is a tendency for downturns in business prosperity to affect petitioner in advance of their influence upon petitioner's customers and the busi-

---

[5] Fire was started quicker and engendered heat faster and more uniformly throughout the furnace.

nesses served by such customers. A concomitant of this situation is that fluctuations in the business cycle are more exaggerated in petitioner's business than in industry generally. This is especially true in the case of petitioner because, with one exception to be hereinafter discussed, petitioner could not and did not produce for inventory but rather manufactured only according to customer specification on orders actually received. The time interval between order and delivery varied directly with the degree of finishing required by the customer. Thus, petitioner may be placed in the category of what is commonly known as a "feast or famine" industry.

Like many other businesses with similar positions in the industrial complex, petitioner operates with rather high fixed costs. Thus, cost per unit of production decreases as the number of units is increased.

### IV. *Product Mix—Production.*

For purposes of convenience, petitioner's products may be classified into four basic categories, described below. The percentage which production[6] (in pounds) in each category bore to total production for the pertinent years is as follows:[7]

| Year | Die blocks (includes inserts, rods, rams) | Commercial forgings | Drop forgings | Locomotive forgings |
|---|---|---|---|---|
| 1934 | 46.17 | 34.66 | 5.49 | 13.68 |
| 1935 | 45.06 | 38.00 | 6.06 | 10.88 |
| 1936 | 36.98 | 42.13 | 7.49 | 13.40 |
| 1937 | 38.27 | 38.18 | 8.79 | 14.76 |
| 1938 | 35.38 | 48.15 | 9.91 | 6.56 |
| 1939 | 48.80 | 34.07 | 9.75 | 7.38 |
| 1940 | 53.25 | 30.75 | 10.92 | 5.08 |

The average prices (in cents per pound) of petitioner's products were as follows:

| Year | All products | Die blocks | | | Commercial forgings | | |
|---|---|---|---|---|---|---|---|
| | | Die blocks, inserts, etc. | Piston rods | Rams | Rough finished | Smooth finished | Other |
| 1934 | 10.23 | 12.49 | 13.94 | 12.72 | 7.50 | 6.79 | 16.92 |
| 1935 | 10.30 | 11.02 | 13.88 | 13.09 | 8.16 | 6.51 | 15.53 |
| 1936 | 9.87 | 12.67 | 13.94 | 12.87 | 8.40 | 6.64 | 13.96 |
| 1937 | 10.95 | 13.34 | 14.79 | 15.03 | 9.65 | 8.09 | 16.79 |
| 1938 | 12.40 | 13.77 | 15.37 | 17.09 | 14.06 | 9.11 | 17.34 |
| 1939 | 12.16 | 13.48 | 15.29 | 14.51 | 13.13 | 8.64 | 17.49 |
| 1940 | 13.15 | 12.93 | 16.65 | 15.33 | 18.12 | 8.87 | 23.45 |
| 1941 | 14.60 | 12.77 | 16.23 | 17.69 | 31.88 | 9.88 | 30.43 |
| 1942 | 15.42 | 12.79 | 16.61 | 18.10 | 24.58 | 10.47 | 38.29 |

[6] For purposes of this case, we treat production as the equivalent of sales as petitioner carried no inventory.

[7] All references to pounds of production establish only the amounts (in pounds) produced rather than the number of units produced. This latter figure would vary according to the degree of machine finishing on particular orders. Unit figures, as such, however, are not available, nor is there any standard for their calculation.

The locomotive forgings production was not a profitable phase of petitioner's operations and was carried at slack times merely to help meet the overhead. Much the same may be said of the drop-forgings segment of the business.

The really profitable phases of petitioner's operations were the die blocks and commercial forgings.

Sales of locomotive forgings were not too important in any of the years here pertinent. The table below shows the trend of sales to selected principal customers by product classification:

| Customer [1] | Dollar sales (000 omitted) | | | | |
|---|---|---|---|---|---|
| | 1936 | 1937 | 1938 | 1939 | 1940 |
| Die blocks: | | | | | |
| Aluminum Corporation of America (Alcoa) | 18 | 43 | 44 | 110 | 284 |
| Renault Motors | 1 | 13 | 0 | 35 | 211 |
| Drop forgings: | | | | | |
| Falk Corp.-Milwaukee | 60 | 41 | 81 | 64 | 269 |
| Kearney Trecker Corp | 7 | 14 | 7 | 33 | 54 |
| Watervliet Arsenal | 0 | 0 | 3 | 35 | 131 |
| Commercial forgings: | | | | | |
| Falk Corporation | 60 | 124 | 81 | 191 | 269 |
| Kearney Trecker Corp | 7 | 5 | 7 | 11 | 54 |

[1] The sales to any particular customer have been allocated to the classification in which the major portions of such sales fall, although there may be small amounts of sales in other classifications, but Falk and Kearney sales have been allocated as between Drop Forgings and Commercial Forgings.

Falk Corporation purchased gear reduction units from petitioner. Such units were used by Falk in the manufacture of parts for United States Navy destroyers, submarines, and other vessels.

Kearney Trecker Corporation was engaged in the production of military supplies. Watervliet Arsenal was a contracting party on behalf of the United States Government; it purchased breech rings and forgings for use in the manufacture of munitions.

The great increase in die block production came about in response to demands by the aircraft industry (largely through sales to Alcoa) for the war effort; the size of the die blocks produced increased as the Navy demands arose. Die blocks were also purchased by the drop-forging industry (for hammer rams, piston rods, saw blocks, crank-shafts, etc.) for use in production of tanks and ammunition.

As part of the prewar buildup petitioner was also called upon to make breech rings for use in guns. Unlike most products produced by petitioner, these items could be stocked and carried in inventory.

On the orders received for products to be used on Federal Government contracts petitioner generally did more finishing (machining) than on other orders. Also, the sizable Government work (especially the gear reduction units) permitted substantially better utilization of existing plant facilities with but little additional manpower. Whereas, petitioner had been operating essentially on one shift during most of the base period, the advent of the war buildup (and the attendant large orders by firms participating in such program) required petitioner to operate on three full shifts.

## V. *Production and Profit History.*

Petitioner's production in pounds, its operating profits (before and after depreciation), and the operating profit (after depreciation) in cents per pound for the years 1922–1942, inclusive, were as follows (nearest dollar):

| Year | Pounds | Operating profit [1] | | Operating profit (after depreciation) (cents per pound) |
|---|---|---|---|---|
| | | Before depreciation | After depreciation | |
| 1922 | (2) | 57,786 | 29,431 | (2) |
| 1923 | (2) | 159,690 | 131,584 | (2) |
| 1924 | (2) | 8,162 | (42,531) | (2) |
| 1925 | (2) | 297,801 | 246,009 | (2) |
| 1926 | (2) | 280,878 | 225,248 | (2) |
| 1927 | (2) | 181,113 | 120,444 | (2) |
| 1928 | 23,841,886 | 600,894 | 527,280 | 2.212 |
| 1929 | 27,356,979 | 668,423 | 579,928 | 2.120 |
| 1930 | 16,162,898 | 106,264 | 11,405 | 0.706 |
| 1931 | 11,083,989 | (88,996) | (189,756) | (1.712) |
| 1932 | 6,824,073 | (114,292) | (219,113) | (3.211) |
| 1933 | 9,250,820 | 51,838 | (10,378) | (0.112) |
| 1934 | 13,022,364 | 212,414 | 153,594 | 1.179 |
| 1935 | 17,208,608 | 306,932 | 247,440 | 1.438 |
| 1936 | 21,966,960 | 316,548 | 250,980 | 1.143 |
| 1937 | 26,667,464 | 511,998 | 437,929 | 1.642 |
| 1938 | 11,079,387 | 71,934 | (4,904) | (0.443) |
| 1939 | 18,996,804 | 350,250 | 272,978 | 1.437 |
| Base period average | 19,677,654 | 312,682 | 239,246 | 1.216 |
| 1922–1939 average | [3] 16,955,186 | 221,091 | 153,754 | 0.907 |
| 1940 | 30,393,224 | 980,462 | 900,576 | 2.936 |
| 1941 | 46,855,513 | 2,047,662 | 1,880,225 | 4.013 |
| 1942 | 62,775,403 | 2,044,630 | 1,863,945 | 2.969 |

[1] As adjusted per revenue agents' reports. The total number of pounds sold for periods prior to 1928 has not been computed.
[2] Not available.
[3] 1928–1939 average.

The Federal Reserve indices of production revealed the following levels of production by petitioner's customers and comparable industries during the years here pertinent (petitioner's levels are also shown for comparisons):

| Year | 1935–1939 average=100 | | | | |
|---|---|---|---|---|---|
| | All manufactures | Durable manufactures | Iron and steel | Steel | Petitioner (pounds—not finished units) |
| 1927 | 94 | 107 | 108 | 100 | (1) |
| 1928 | 99 | 117 | 121 | 115 | 124.3 |
| 1929 | 110 | 132 | 138 | 127 | 142.6 |
| 1930 | 90 | 98 | 97 | 91 | 84.3 |
| 1931 | 74 | 67 | 61 | 59 | 57.8 |
| 1932 | 57 | 41 | 32 | 31 | 35.6 |
| 1933 | 68 | 54 | 54 | 54 | 48.2 |
| 1934 | 74 | 65 | 61 | 61 | 67.9 |
| 1935 | 87 | 83 | 81 | 81 | 89.7 |
| 1936 | 104 | 108 | 114 | 114 | 114.5 |
| 1937 | 113 | 122 | 123 | 121 | 139.0 |
| 1938 | 87 | 78 | 68 | 68 | 57.8 |
| 1939 | 109 | 109 | 114 | 115 | 99.0 |
| 1927–1939 average | 90 | 91 | 90 | 87 | [2] 88.4 |
| 1936–1939 average | 103 | 104 | 105 | 104 | 102.6 |

[1] Not available.
[2] 1928–1939 average.

SOURCE: Board of Governors of the Federal Reserve System, Federal Reserve Index of Industrial Production, Oct. 1943, pp. 46, 47, 48.

FEDERAL RESERVE INDEXES OF PRODUCTION: MACHINERY, AUTOMOBILES, RAILROAD CARS AND LOCOMOTIVES, WITHOUT SEASONAL ADJUSTMENT, FOR YEARS 1927–1939

| Year | 1935–1939 average = 100 | | | |
|------|------------|------------------------------|------------------|-------------|
|  | Machinery | Automobile factory sales [1] | Railroad cars | Locomotives |
| 1927 | 99 | 88 | 149 | 206 |
| 1928 | 106 | 113 | 122 | 147 |
| 1929 | 130 | 139 | 163 | 220 |
| 1930 | 100 | 87 | 134 | 197 |
| 1931 | 66 | 62 | 64 | 74 |
| 1932 | 43 | 36 | 55 | 42 |
| 1933 | 50 | 50 | 43 | 30 |
| 1934 | 69 | 71 | 75 | 71 |
| 1935 | 83 | 104 | 72 | 59 |
| 1936 | 105 | 114 | 113 | 97 |
| 1937 | 126 | 122 | 157 | 184 |
| 1938 | 82 | 67 | 71 | 78 |
| 1939 | 104 | 94 | 88 | 82 |

[1] Considered by Federal Reserve Board as representing automobile production. Automobile parts production is included for years after 1934.

SOURCE: Board of Governors of the Federal Reserve System, Federal Reserve Index of Industrial Production, Oct. 1943, pp. 49, 51, 52, 26, and Division of Research and Statistics.

Petitioner's sales (in dollars) by months in 1939 and 1940 progressed as follows:

| | 1939 | 1940 | | 1939 | 1940 |
|--------|------|------|-----------|------|------|
| January | $132, 626 | $329, 117 | July | $154, 158 | $255, 877 |
| February | 154, 378 | 277, 165 | August | 207, 647 | 330, 457 |
| March | 187, 843 | 298, 392 | September | 227, 052 | 383, 295 |
| April | 144, 160 | 336, 027 | October | 271, 504 | 429, 311 |
| May | 185, 362 | 314, 740 | November | 250, 087 | 420, 074 |
| June | 203, 944 | 305, 590 | December | 301, 723 | . 483, 671 |

OPINION.

Petitioner's claim for relief under the provisions of section 722,[8] more particularly paragraphs (1), (2), and (4) of subsection (b),[9]

---

[8] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayer generally occurring or existing after December 31, 1939, except that, in cases described in the last sentence of section 722(b)(4) * * * regard shall be had to the change in the character of the business under section 722(b)(4) * * * to the extent necessary to establish the normal earning to be used as the constructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on

is predicated upon four alleged qualifying circumstances arising just prior to and during the base period. It submits the following contentions (relative to its business operations in the 1934–1939 period) in support of its argument that the average base period net income (determined without reference to section 722) is not truly representative of normal earnings: (1) That its normal operations in Plant No. 1 were suspended during part of 1936 due to the extensive plant rehabilitation and modernization program; (2) that petitioner and the industry of which it was a member was "depressed during the base period"; (3) that there was a "change in management" beginning with the death of Charles in 1933; and (4) that there was, as a result of the plant modernization program, an increase in petitioner's capacity for production.[10] We shall discuss these alleged grounds in the order enumerated.

1. *1936 Plant Rehabilitation—722 (b) (1).*—It is now settled that paragraph (b) (1) refers to physical events or occurrences affecting the taxpayer's business rather than to economic events which are included under (b) (2). *Matheson Co.*, 16 T.C. 478, 486 (1951); *South-*

income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer,

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

\* \* \* \* \* \* \*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business 2 years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purpose of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation \* \* \*. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, \* \* \* shall be deemed to be a change on December 31, 1939, in the character of the business, \* \* \*

9 Petitioner does not, either at the hearing or on brief, press a claim under (b) (5), and we now deem it abandoned. *Hearn Department Stores, Inc.*, 23 T.C. 266, 283–4 (1954). In any event, it has introduced no facts and adduced no arguments separate from those which might affect its qualification under paragraphs 1, 2, or 4 of 722(b). *Houghland Packing Co.*, 28 T.C. 519, 536 (1957) ; *Napco Industries, Inc.*, 30 T.C. 198, 199 (1958) ; *Robertson Factories, Inc.*, 31 T.C. 1106, 1120 (1959) ; cf. *Glenshaw Glass Co.*, 23 T.C. 1004 (1955).

10 Petitioner points out on brief that during the 1930's there was a danger that its basic 1923 patent essential to its die block production might not be renewed (two further patents were granted in 1938) and that it delayed improvements to its plant until William became confident that the patent protection would continue. We may assume *arguendo* (despite contrary implications in the record) that this concern was the cause of the delay but petitioner has in no way demonstrated how such fact, of itself, establishes the existence of a factor cognizable under any paragraph of section 722(b). We therefore consider this portion of petitioner's argument to be merely a part to its alleged "increase in capacity."

*ern California Edison Co.*, 19 T.C. 935, 980 (1953); sec. 35.722–3(a), Regs. 112.

Where an unusual physical event of extraordinary severity and rare occurrence has caused a decline in a taxpayer's earnings below their normal level, we have granted relief under 722(b)(1). *Treesweet Products Co.*, 27 T.C. 249 (1956) (the most severe freeze in the area, in both temperature and duration, had affected taxpayer's orange crop); see *Puget Sound Pulp & Timber Co.*, 30 T.C. 398 (1958) (Japanese invasion of Shanghai and destruction of Chinese mills there caused such mills to cancel orders to taxpayer); *Jerry Anderson, Inc.*, 29 T.C. 972 (1958) (strike); *Rocky Mountain Drilling Co.*, 25 T.C. 1195 (1956); *Schneider's Modern Bakery, Inc.*, 19 T.C. 763 (1953) (strike). See also *George Moser Leather Co.*, 31 T.C. 830, 839 (1959) (flood; but relief denied because petitioner could not prove that income credit as reconstructed under (b)(1) was higher than credit available under invested capital method. Likewise, *Avey Drilling Machine Co.*, 16 T.C. 1281 (1951).)

However, these causative events must be proven to have been due to external factors over which the taxpayer had no control rather than to internal management decisions of the taxpayer's personnel. Relief has consistently been denied where the alleged unusual physical event was attributable solely to a choice by the taxpayer to pursue a course of action (whether or not prudent), *Pied Piper Shoe Co.*, 28 T.C. 499, 515 (1957) (see also *Granite Construction Co.*, 19 T.C. 163, 169 (1952)), or to squabbles or difficulties of internal origin, *Matheson Co.*, *supra* at 486.

In *Pied Piper Shoe Co.*, *supra*, the taxpayer's plant was twice shut down when its new management first assumed control in order for that management to reinstate the manufacture of the high-quality line of shoes which the outgoing management had abandoned. The record made it clear that such action was wise and undoubtedly in the best business interests of the taxpayer. However, we denied relief under (b)(1) with the observation (p. 515):

> We do not agree with the petitioner that these events or circumstances fall into the category of physical or economic circumstances as are contemplated by either (b)(1) or (b)(2). The closing down of the petitioner's plant at two different times during the reorganization which took place following the exit of the Huth & James management is not the type of physical event contemplated under subsection (b)(1). The regulations enumerate fires, floods, and explosions as being the type of events contemplated by subsection (b)(1). Regs. 112, sec. 35.722–3(a). Here the closing of the plant was an act of the petitioner's management. * * *

The cases under subsection (b)(2) present a close parallel for purposes of the issue here presented. See *Southern California Edison Co.*, *supra* at 980–981. Under (b)(2) we have held that events caused by internal business policies do not constitute grounds for relief.

*Foskett & Bishop Co.*, 16 T.C. 456, 463 (1951) ; *Granite Construction Co., supra* at 170; *Natatorium Laundry Co.*, 33 T.C. 203, 212–213 (1959).

We hold that the plant rehabilitation is not a factor cognizable under 722(b)(1).

2. *Depressed Conditions in Petitioner's Industry—722(b)(2).*— The traditional and logical criterion for determining a taxpayer's right to relief under this paragraph is the comparison of the taxpayer's base period profits with those earned over a longer, reasonable period of time. *Monarch Cap Screw & Manufacturing Co.*, 5 T.C. 1220, 1228 (1945) ; *Foskett & Bishop Co., supra* at 462; *Strickland Cotton Mills*, 19 T.C. 151 (1952) ; *Granite Construction Co., supra* at 170–171, and cases there cited. The purpose of such an analysis is to enable the measurement of base period earnings against those of a period which is of sufficient duration to even out the peaks and troughs in the business cycle and thus to permit the theoretical "normal" level of earnings to be ascertained. If the base period average is greater than that of the longer period the conclusion generally follows that there were no temporary economic circumstances or events depressing the earnings of the taxpayer or its industry during the base period. But see *Boonton Molding Co.*, 24 T.C. 1065, 1084 (1955). For that matter, even where the base period average is lower than that of the longer period relief may be denied where the decline is due to normal competitive factors (see, e.g., *Blue Diamond Coal Co.*, 31 T.C. 777, 798 (1959) ; *Orangeburg Manufacturing Co.*, 37 T.C. 251 (1961), and cases there cited).

By the above standards we must conclude that petitioner's business was not depressed during the base period. Its 4-year average in terms of pounds produced was well in excess of the average for the 1927–1939 period. This latter period covered the whole range of the business cycle, including the very prosperous years of 1928–1929. Likewise its average operating profit was far greater for the base period than for the longer 1922–1939 period. Furthermore, its sales price per pound was rising in marked contrast to the usual pattern in a depressed industry or business. This circumstance would seem to make this case stronger for respondent than was *Strickland Cotton Mills, supra*.

The record also clearly refutes any contention that petitioner's customers or the industries of which they were members were depressed during the base period by any "unusual circumstances." All the customer-industries were producing at levels in excess of the 1927–1939 average.

In certain cases, such as in *Boonton Molding Co., supra*, the taxpayer is an expanding, dynamic business so that the earlier period

profits cannot and should not be deemed representative of the "normal" level attained by the taxpayer at the commencement of the base period. See *Ainsworth Manufacturing Corporation*, 23 T.C. 372 (1954) ; cf. *Orangeburg Manufacturing Co.*, *supra*, where the taxpayer was in just the opposite position. There is some support in the record for the contention that petitioner was in an expansion phase of its business during the base period, however, petitioner does not so argue and has made no attempt to provide us with a more accurate standard against which to gage its base period activities.

In any event, where taxpayers seek to prevail under 722(b) (2) they must identify the alleged "temporary economic circumstance" and demonstrate its causal connection with the depression in base period earnings. *Trunz, Inc.*, 15 T.C. 99, 103 (1950) ; *George Moser Leather Co.*, *supra* at 840; *Miami Valley Coated Paper Co.*, 28 T.C. 492, 498 (1957). The event usually relied upon is the loss of one or more members of a small group of major customers. *Southern California Edison Co.*, *supra; Ainsworth Manufacturing Corporation*, *supra; Boonton Molding Co.*, *supra; Empire Construction Co.*, 31 T.C. 857 (1959). See *S. N. Wolbach Sons, Inc.*, 22 T.C. 152 (1954), for other possible (b) (2) events. Under all these cases it is clear that the reason for such loss must be some unusual, drastic, nonrecurring event and not simply the operation of normal competitive forces. For example, in *Ainsworth Manufacturing Corporation*, *supra*, the majority of the taxpayer's business was derived from the sale of brakeshafts to Ford and adjustable windshields to Ford and Chrysler. Both were excellent customers. With little advance warning both customers discontinued use of these products. The taxpayer's plant had been built especially to mass-produce these articles. We granted relief with the observation (23 T.C. at 375) :

> The evidence indicates rather clearly that the earnings of the petitioner, in all probability, would have fluctuated during the base period about in proportion to the average earnings of the industry of which it was a part if the discontinuance of the use of the brakeshafts and adjustable windshields by Ford and Chrysler had not occurred during that period ; the earnings of the petitioner fell off to a much greater extent during 1938 and 1939 than they otherwise would have ; the unusual falling off of those earnings was due primarily to the loss of the brakeshaft and adjustable windshield business formerly received from Ford and Chrysler ; that falling off was temporary and peculiar to the petitioner and perhaps one or two other manufacturers subjected to the same blow ; and it was unusual in that nothing even closely comparable in cause, magnitude, and effect had ever occurred in the petitioner's history. * * *

If the taxpayer can show only a general depression and is unable to isolate the particular causative external economic event the inference to be drawn is that the decline is due to normal competitive or cyclical factors and therefore relief will be denied. *Miami Valley Coated*

*Paper Co., supra;* see also *Overland Corporation,* 34 T.C. 1001, 1048 (1960), where we said:

Not every external cause of depressed earnings is a ground for relief under section 722. The existence of a general business recession in 1938 is not sufficient to justify excess profits tax relief under section 722(b)(2). *Brown Paper Mill Co.,* 23 T.C. 47; *Industrial Yarn Corporation,* 16 T.C. 681; Bulletin on Section 722, p. 17.

Petitioner served a diversified group of customers, there being no one or few customers upon whom it was especially dependent. Thus it is highly dubious that the loss of any particular customer due to unusual factors cognizable under (b)(2) would have had any serious repercussions upon the overall profitability of petitioner's business. On this point, cases such as *Southern California Edison Co., Ainsworth Manufacturing Corporation,* and *Boonton Molding Co.,* all *supra,* are distinguishable. Moreover, petitioner has not produced the slightest evidence that any customers were lost due to unusual events nor has there been demonstrated, of record, any other factor apart from the operation of the normal rules of supply and demand and the usual fluctuations in the business cycle which could have caused a temporary depression in 1936–1939 earnings and thus lead us to conclude that petitioner's base period earnings were an inadequate standard of normal earnings.

3. *Change in Management—722(b)(4).*—To establish a "change in management" cognizable as a "change in the character of the business" within the meaning of (b)(4) petitioner must show a drastic and pronounced change in personnel accompanied by a fundamental change in business policy. *Toledo Stove & Range Co.,* 16 T.C. 1125, 1132–1133 (1951); *Robertson Factories, Inc., supra* at 1116; sec. 35.722–3(d), Regs. 112; Bulletin on Section 722, pt. V (C) 1, p. 50. Routine changes, even in "key" personnel, unaccompanied by a difference in overall approach to sales or production do not fall within the purview of the statute.

Petitioner's argument upon this aspect of the case is exceptionally vague and its proof is nonexistent. Apparently, it would have us decide that the plant modernization program which reached its fruition under the guidance (though not titular control) of William constituted the basic change in direction. However, the record undeniably shows that the need for plant modernization was acknowledged by all members of the Finkl family during Charles' regime as general manager. The actual changes were postponed in the early 1930's only because: (1) Petitioner's then short cash position coupled with the general and prolonged slump in the national economy made the overhaul seem then inadvisable; (2) there existed a feeling on

the part of the entire family (including William)[11] that the then-prevailing competitive situation did not compel extensive rehabilitation. It was the usual policy of petitioner not to make large expenditures unless it was certain that such were mandatory under existing business conditions.[12]

William testified generally to the effect that his uncles Fred and Frank, although efficient, were conservative by nature and lacked his (William's) energy and aggressiveness and that their influence over Charles was stronger than it was over him. Perhaps, there is some truth to this loose generalization but as we understand the situation Fred and Frank were primarily production men with comparatively little voice in the financial aspects of management. William's grandfather, Anton, together with Charles' wife, Elizabeth, assisted William when he took over upon Charles' death in 1933. Anton apparently still had considerable influence then and was petitioner's president until his death in 1938. The record is devoid of any instances of disharmony throughout the entire period of the changes. William's assumption of managerial control was thus a gradual process, guided by Anton and Elizabeth. From all that we can gather the transition from Charles' regime to William's was a normal, peaceable change, unmarked by any dynamic innovations; essentially it was the continuation of the family-operated business. *Toledo Stove & Range Co., supra.* Cf. *National Screw & Manufacturing Co.*, 32 T.C. 490, 509 (1959).

In the *National Screw* case, there was complete reversal of prior policy when the old, inefficient chief executive officer was replaced by a competent outsider who completely renovated the taxpayer and changed its methods of operation. Relief was granted on the theory that cumulative effect of all the changes constituted "a major revision." See also *7-Up Fort Worth Co.*, 8 T.C. 52, 63-64 (1947). In the instant case, there is not the remotest suggestion that the management of Charles was incompetent. To the contrary, it was generally recognized to be quite efficient. We conclude that the *National Screw* case is inapplicable and that there is no basis for the conclusion that the changes here effected were sweeping or drastic. See, generally, on the overall question of "change or character," *Wisconsin Farmer Co.*, 14 T.C. 1021, 1028-1029 (1950).

In any event, petitioner has failed to establish that any of these "changes" *caused* an increase in earnings beyond those which would

---

[11] As we noted in our findings, all vital managerial decisions were made by the family as a unit. William himself testified:

"It wasn't a case of voting, endorsing, and condoning it. In our company, practically everything was done by unanimous agreement. We would sit down and talk it over until we got unanimous agreement."

[12] In the candid, if rather blunt, words of petitioner's long-time plant manager: "and I might say for the Finkl Company, we never went out and spent a lot of money unless we had to spend it."

have been derived had Charles remained at the helm. Such proof is crucial to relief under (b)(4). *Robertson Factories, supra.* The precise date of William's rise to power has not been pinpointed. By any interpretation, such ascension must be deemed to have been completed by 1938 when, upon Anton's death, William became titular as well as actual head of petitioner. Yet, this event was not paralleled or followed by any unusual increase in earnings or production beyond what might be attributable to the general economic recovery. *National Screw & Manufacturing Co., supra* at 510. In fact in 1939 petitioner's recovery was slower than that of the industries most comparable to it as revealed by the indices set forth in our findings. Only the advent of World War II and the concomitant large increase in repetitive quantity orders from Government agencies and contractors enabled petitioner to restore its growth rate to equal that of the general economy. (See discussion under *"Change in Capacity."*)

4. *Change in Capacity—722(b)(4).*—We have no doubt that petitioner's extensive improvements contributed to a general increase in plant efficiency. Their major purposes were to permit quicker handling of materials with consequent savings in time and labor; to enable better temperature control in the furnaces, thereby reducing internal rupture and cracking; to permit finer machining in order to meet the specifications of customers who were continually demanding closer tolerances. These changes were imperative if petitioner was to maintain its competitive position.[13] The record supports the conclusion that this consideration furnished the motivation for the improvements. Whether or not these improvements effected any absolute cost saving or profit increase is, to say the least, conjectural,[14] and relief could well be denied simply upon petitioner's failure to adduce such proof.

However, we may here place our denial of relief upon a more fundamental ground. The statute is concerned with increases in "capacity for production" rather than with routine changes or mere improvements in efficiency. *Suburban Transportation System,* 14 T.C. 823, 833 (1950); *Newburgh Transfer, Inc.,* 17 T.C. 841 (1951); *Triangle Raincoat Co.,* 19 T.C. 548, 566–567 (1952); *Napco Industries, Inc.,* 30 T.C. 198 (1958). The two concepts of course are often interrelated. For example, here the labor and timesaving devices, princi-

---

[13] This position was of course enhanced by the near monopoly which the special patents and their renewals enabled it to enjoy in the die block field. However, there was keen competition with Heppenstall, the licensee of the same patents, and of course always the possibility of competition with producers of other types of die blocks from inferior quality alloy steels.

[14] We observe that despite generally rising prices (per pound) for petitioner's production, the cost-price squeeze prevented petitioner from increasing its profit margin during the base period. Thus, petitioner's operating profit per pound in 1939 was identical to that earned in 1935 even though (1) 1939 production was higher, and (2) petitioner's product mix was more favorable in 1939 because it included a greater percentage of the high-profit die blocks and a smaller percentage of the unprofitable locomotive forgings. These observations lead us to doubt whether the plant improvements actually resulted in better profits.

pally the manipulators, permitted petitioner to bring its production from the processing departments to the hammers and presses for forging more expeditiously. We therefore agree with petitioner that such improvements *could* increase capacity.

The difficulty with petitioner's position, however, is that there is no proof that actual capacity was increased. In 1929 petitioner produced more pounds than in any year during the base period. It may be that due to increased finishing in the later year, the production in terms of number of units was greater in, say, 1937 than in 1929 but petitioner has not furnished us with any ratio or table of equivalents by which we can convert pounds into units for any period.[15] In this aspect the case resembles *Farmers Creamery Co. of Fredericksburg, Va.,* 18 T.C. 241 (1952), where we had occasion to observe with reference to the taxpayer's claimed increase in capacity (p. 253):

And aside from any inferences we may draw from the "changes" themselves little remains in the record as a possible source of support for petitioner's claim. It introduced no evidence whatever in quantitative terms, based on some acceptable standard of measurement, as to the productive capacity of the plant before and after the "changes" were made, and it has failed to show in this manner that actually its productive capacity was affected to a substantial extent. Such evidence can reasonably be assumed to have been available to petitioner, and the omission in its proof in this regard may properly be taken to signify a lack of merit in its position. Cf. *Wichita Terminal Elevator Co.,* 6 T.C. 1158, 1165, affd. (C.A. 10) 162 F. 2d 513. * * *

Thus, the best that we can do is to compare base period pounds with 1929 pounds. Furthermore, we know that most of the increased machining occurred only when Government orders became the major phase of petitioner's business. Thus the significance of the increased machining insofar as it affects the quantity of production is comparatively slight during the base period. By the usual standards, the conclusion that petitioner experienced no increase in capacity during the base period seems inescapable.

Moreover, the basic changes alleged to have created the increased capacity were mostly completed by 1937 and yet in 1938 and 1939 production was well behind even the 1936 level. Petitioner's business, owing to its essential characteristics was wont to anticipate general recoveries in business (see, e.g., 1934 and 1935); however, its rate

---

[15] See footnote 7. Petitioner as much as concedes the absence of such proof on reply brief where it states:

"We would love to be able to show the loss of weight by increased machining in 1939 over 1935 but cannot do so without indulging in rank fancy. The absence of a source of records that would prove to a mathematical certainty a given figure does not prevent the Court from using its experienced and mature judgment ascertained from the facts available."

Apparently petitioner has reference to the doctrine of *Cohan* v. *Commissioner,* 39 F. 2d 540 (C.A. 2, 1930), but we are given absolutely no facts or even approximations upon which to base the desired estimates. Any estimate we might make upon such a dearth of information would be sheer guesswork.

William himself testified to the effect that base period capacity was almost impossible to estimate, and that ratio of pounds to units was never constant.

of recovery after the 1938 recession was considerably slower than might have been expected based upon prior experience.[16] These considerations indicate an absence of increased capacity within the meaning of 722(b)(4). See *National Grinding Wheel Co.*, 8 T.C. 1278, 1285 (1947); cf. *National Screw & Manufacturing Co.*, *supra* at 510.

Nor is a mere theoretical increase in capacity sufficient to entitle a taxpayer to relief under (b)(4). Rather, our task is to ascertain how volume and earnings would have reacted if the alleged capacity increase had been in use 2 years earlier. Stated otherwise, we must decide whether there would have been sufficient demand during the base period to absorb the additional production which would be made possible by the alleged increased capacity. Unless we can supply an affirmative answer to such inquiry, we must deny relief. *National Grinding Wheel Co.*, *supra; Green Spring Dairy, Inc.*, 18 T.C. 217, 238 (1952); *Farmers Creamery Co. of Fredericksburg, Va.*, *supra* at 255; *Patent Button Co. of Tennessee*, 27 T.C. 471, 478 (1956); *Coats & Clark, Inc.*, 35 T.C. 113, 134 (1960).

On the record before us we are compelled to give a negative answer. As respondent has amply demonstrated on brief, the large upsurge in petitioner's volume (in pounds) occurred only when such customers as Alcoa, Falk Corporation, Kearney Trecker Corporation, and Watervliet Arsenal commenced receiving orders for materials and supplies essential to the war effort. Petitioner argues in rebuttal that *respondent* has failed to establish that this war-induced demand was the occasion for the upturn in petitioner's volume or even that these named customers were concerned primarily with the war effort. The simple answer to this contention is that the burden falls upon petitioner to prove the contrary and petitioner does not even argue that it has done so. Beyond this, however, from the mass of documentary evidence (corroborated indeed by William's testimony) in this case, we have found much support for respondent's position and nothing to refute it. We here have reference to statements contained: (1) In correspondence between and among petitioner, its customers, and various Governmental agencies; and (2) in various submissions by petitioner to Governmental agencies, including those made in connection with renegotiation of Government contracts. It is undisputed that the erection of Plants 3 and 4 was undertaken solely on account of the war effort.

We thus accept the respondent's contentions and observe that these increasing Government orders arose predominantly in the high-profit die-block category. This undoubtedly caused the improving profit picture.

---

[16] For example, petitioner's 1939 index number (based on 1935–1939 = 100) was only 99 compared to its 1936 number, 114.5, whereas the 1939 index numbers for both durable and "all manufactures" exceeded their corresponding 1936 number.

Even more convincing than the above analysis is the overwhelming evidence garnered largely from petitioner's own witnesses that the influx of war-stimulated orders (such orders being repetitive, larger in size, more standardized, and requiring a greater degree of machining in contrast to peacetime orders) was the essential factor which permitted petitioner's better utilization of its labor force and machinery. When interrogated, on cross-examination, concerning petitioner's productive capacity, William frankly testified:

A. To be on the level within, and square it up, why you—you can't give an accurate estimate. You asked me whether I could give you an accurate estimate. Nobody can say they can give you an accurate estimate,—I told you before your product mix and the duplication you get,—to give you an example, in the period you spoke of from '41 on, whereas, one of our main customers in the gear field, we started out making gear production units. And by, during the process of the build-up, the navy came in and said, we'll need five units a month, ten, then, 20, with the same amount of men, the same amount of tools, practically, the same hours of operation. It was astronomical the way we brought that up by developing skill in the men and a little extra attachments here and there in the tooling of these gear units that go into speed production, that go in between the terminal and power shaft in the cruiser.

Q. So, that, actually your base period production was probably far below the potential production capacity of the plant?

A. That is right. That is one reason I say to give an accurate estimate—I could honestly say it is way up there when, in my heart, if I figure I would get up this far, and that would be way above those figures you have there.

This testimony from a thoroughly reliable source demonstrates the existence of excess capacity during the base period. We are reinforced in our belief that such excess existed by the circumstance that petitioner operated essentially on but one shift throughout the base period. We believe that the record abounds in affirmative evidence that there would have been no market for any additional production, even assuming it to have been available, throughout the base period.

The instant case presents a classic situation for denial of relief under (b) (4) as inconsistent with the stated Congressional purpose in the enactment of the World War II excess profits tax legislation: "the rearmament program should furnish no opportunity for the creation of new war millionaires." H. Rept. No. 2894, 76th Cong., 3d Sess., pp. 1–2; cf. *Philadelphia, Germantown & Norristown R.R. Co.*, 6 T.C. 789, 798 (1946).

We are unable to find that there was a change in "capacity for production or operation" during the base period as that concept is employed in the statute. Relief under this aspect of 722 (b) (4) is denied.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*